# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

BRYAN J. JOHNS, individually and on
behalf of the Morris & Associates, Inc.
Employee Stock Ownership Plan,

         **Plaintiff,**

v.

WILLIAM F. MORRIS III, DORIS
MORRIS, RANDY CLAPSADL,
ROBERT F. WARWICK, BRUCE
BOWERS, JOHN KIMBER, NED
LEARY, ED LEONARD, JOHN SHELL
and MORRIS & ASSOCIATES, INC., a
North Carolina Corporation,

         **Defendants.**

Case No. 5:23-cv-00324

## COMPLAINT

Plaintiff Bryan J. Johns, as a trustee of and a participant in the Morris &

Associates, Inc. Employee Stock Ownership Plan, individually and on behalf of the Plan,

by his undersigned attorneys, alleges upon personal knowledge, the investigation of his

counsel, and upon information and belief as to all other matters, as to which allegations

he believes substantial evidentiary support will exist after a reasonable opportunity for

further investigation and discovery, as follows:

## INTRODUCTION

1.    Plaintiff Bryan J. Johns ("Plaintiff" or "Johns") brings this suit against

William F. Morris III ("Bill III"), Doris Morris, Randy Clapsadl, and Robert ("Bob") F.

Warwick ("Warwick") (together, "Trustee Defendants"), who were and/or are fiduciary trustees for the Morris & Associates, Inc. Employee Stock Ownership Plan (the "Plan" or "ESOP") in the "Relevant Period" of June 2017 to the present, when the Plan's shares of common stock of Morris & Associates, Inc. ("Morris Inc." or the "Company") were undervalued to the detriment of the Plan and its participants and beneficiaries; and against Morris Inc., the fiduciary Plan Administrator and sponsor of the ESOP. Plaintiff also brings this action against the Directors of Morris Inc., including not only Bill III, but also Bruce Bowers, John Kimber, Ned Leary, Ed Leonard, and John Shell (hereafter "the Board Defendants"). With the exception of Bill III, the Board Defendants are named solely with respect to Plaintiff's claim seeking injunctive relief.

2.     Plaintiff is and was throughout the Relevant Period a fiduciary trustee of the Plan and a participant in the Plan, who was vested under the terms of the Plan in shares of Morris Inc. allocated to his Plan account.

3.      This action is brought on behalf of the Plan and for relief to the Plan under Sections 404, 409, and 502(a)(2)-(3) of ERISA, 29 U.S.C. §§ 1104, 1109, and 1132(a)(2)-(3), for losses suffered by the Plan and for restoration to the Plan of any improper profits received by the Plan's fiduciaries and parties in interest to the detriment of the Plan's participants and beneficiaries resulting from Defendants' breaches of fiduciary duty in violation of ERISA, and for equitable relief, including removal of the Trustee Defendants as fiduciaries and enjoinment of them from acting as named or functional fiduciaries, and appointment of independent fiduciaries to serve as Plan trustees with Plaintiff. Count IV is brought on behalf of Plaintiff for equitable relief to

2

Plaintiff individually under Sections 502(a)(3) and 510 of ERISA, 29 U.S.C. §§ 1132(a)(3) and 1140, to remedy Bill III and Morris Inc.'s unlawful discharge of Plaintiff from his employment at Morris Inc. and discrimination against Plaintiff for exercising his rights under ERISA and the Plan's governing documents.

4.      Of the five Plan Trustees in the Relevant Period, Plaintiff alone is endeavoring to meet his ERISA fiduciary obligations to "discharge his duties with respect to [the] plan solely in the interest of the participants and beneficiaries"; for the purpose of "providing benefits to participants and their beneficiaries"; and with the "care, skill, prudence, and diligence" required to ensure they receive the benefits to which they are due. 29 U.S.C. § 1104(a)(1). For his efforts, Plaintiff was discharged from his position as Chief Operating Officer (COO) at Morris Inc. by Bill III and the Company. Plaintiff brings this lawsuit to protect the Plan and its participants and beneficiaries.

5.      The Trustee Defendants include (i) Bill III, who is the largest Company shareholder other than the ESOP and is its Chief Executive Officer (CEO) and Chairman of its Board of Directors; (ii) Bill III's wife Doris, who is a shareholder and Payroll Manager at the Company; (iii) Bill III's son-in-law Randy, who is President of the Company; and (iv) Bill III's long-time business partner, Warwick. They are a conflicted group not acting in the interest of the participants and beneficiaries of the ESOP, which is the majority shareholder of the Company, but in the interest of Bill III and the Morris family, who are minority shareholders but maintain firm control over the Company and the ESOP.

Case 5:23-cv-00324-D-RJ   Document 1   Filed 06/16/23   Page 3 of 40

6. The ESOP's Company stock is and has been undervalued due to Defendants' breaches of ERISA because, *inter alia*, Morris Inc. has a large amount of cash that was not factored into the value of the stock by the valuator Bill III hired. The Plan and its participants have been injured due to the undervaluation of stock in the Plan's trust, particularly where individual participant accounts in the Plan have not held the fair market value of the stock, and participants were shortchanged of their pension benefits upon cashing out of the Plan on retirement, death, disability, or other termination of employment. Further, Bill III has controlled the Company and the ESOP to benefit himself and his family by filling the Board with insiders and close associates who have engaged in little or no oversight over Bill III's compensation and management of the Company. Defendants are liable for such losses. Further, Plaintiff should be reinstated as Company COO and made whole for lost salary and benefits.

## JURISDICTION AND VENUE

7. This action arises under Title I of ERISA, 29 U.S.C. §§ 1001 *et seq.*, and is brought by Plaintiff under ERISA § 502(a), 29 U.S.C. § 1132(a), to require Defendants to make good to the Plan losses resulting from their violations of the provisions of Title I of ERISA; to obtain appropriate equitable relief against Defendants, including but not limited to surcharge and their removal as fiduciaries and an injunction against their functioning as fiduciaries; to restore to the Plan any profits that have been made by breaching fiduciaries, parties in interest, or others in violation of ERISA; and to obtain other appropriate equitable relief and legal remedies in order to redress violations and enforce the provisions of ERISA.

4

8.     This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and it has original jurisdiction pursuant to 28 U.S.C. § 1331.

9.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, because some or all of the events or omissions giving rise to the claims occurred in this District, and because a defendant resides or may be found in this District. The Plan is administered in Garner, North Carolina, where Defendant Morris Inc. is headquartered.

## PARTIES

### A.     Plaintiff Johns

10.     Plaintiff Bryan J. Johns is and was a Trustee to the ESOP from 2008 to present. Accordingly, he is and was a fiduciary to the Plan in the Relevant Period.

11.     Plaintiff is a party to the Morris & Associates, Inc. Employee Stock Ownership Trust Agreement ("Trust Agreement"), which was made January 19, 2011, to create the Morris & Associates, Inc. Employee Stock Ownership Trust (the "ESOP Trust"). Plaintiff is identified in the Summary Plan Description of Morris & Associates, Inc. Employee Stock Ownership Plan and Trust dated January 27, 2017 (the "SPD") as a Plan Trustee.

12.     As Plan Trustee, Plaintiff is and was throughout the Relevant Period a "named fiduciary," within the meaning of 29 U.S.C. § 1102(a), under the terms of the written instruments under which the Plan was established and maintained.

5

13.     Plaintiff is and was a participant, as defined in 29 U.S.C. § 1002(7), in the Plan throughout the Relevant Period. He was vested in shares of Morris Inc. in his Plan account under the terms of the Plan.

14.     Plaintiff was employed by Morris Inc. from August 2007 to his discharge on or about April 24, 2023. He was the Company's President for approximately ten years, and was most recently the Company's Chief Operating Officer (COO). He resides in Clayton, North Carolina, in Johnston County, in this District.

**B.     Defendant Morris Inc.**

15.     Defendant Morris & Associates, Inc. adopted the ESOP effective January 1, 2003. Morris Inc. was at all relevant times the ESOP's "plan sponsor" under 29 U.S.C. § 1002(16)(B). The Plan's participants are current or former employees of Morris Inc.

16.     Morris Inc. is and was at all relevant times the "administrator" of and a "named fiduciary" of the ESOP, as those terms are defined in 29 U.S.C. §§ 1002(16)(A), 1102(a). Accordingly, Morris Inc. is and was a fiduciary to the Plan in the Relevant Period.

17.     Morris Inc. was also a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A) when it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

18.     Morris Inc. was at all relevant times a party in interest to the Plan under 29 U.S.C. § 1002(14)(A) and (C).

6

19.     Morris Inc. is headquartered at 803 Morris Drive, Garner, North Carolina 27529, in this District.

**C.    Trustee Defendants**

20.     Defendant William F. Morris III ("Bill III") is Morris Inc.'s Chief Executive Officer (CEO) and Chairman of its Board of Directors. He is the largest shareholder of Morris Inc., aside from the ESOP, and has at all relevant times owned more than 10% of its outstanding common stock. He is the son of the Company's founder, William F. ("W.F.") Morris, Jr.

21.     In the Relevant Period, Bill III was an ESOP Trustee through November 2018. Bill III is a party to the Trust Agreement and is identified in the Plan's Summary Plan Description ("SPD") as a Plan Trustee. Accordingly, he was a fiduciary to the Plan in the Relevant Period.

22.     Bill III was also a functional fiduciary to the Plan under 29 U.S.C. § 1002(21)(A) when he exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan. Bill III was a functional fiduciary of the Plan during his term as Trustee. Bill III was a functional fiduciary of the Plan *after* his replacement as Trustee because (i) he exercised discretionary authority due to his power to appoint fiduciaries; (ii) his authority and influence over the relatives, employees, business associates, and appointees who served as Plan fiduciaries and executed or failed to oppose his wishes; (iii) his control over Morris Inc., the Plan

7

Administrator; and (iv) his usurpation of Plan fiduciaries' discretionary authority and functions.

23.     As Plan Trustee and Company Director, Bill III is and was throughout the Relevant Period a "named fiduciary," within the meaning of 29 U.S.C. § 1102(a), under the terms of the written instruments under which the Plan was established and maintained.

24.     Bill III is and was throughout the Relevant Period a party in interest to the Plan under 29 U.S.C. §§ 1002(14)(A) and (H), as a fiduciary, officer, director, and 10% or more shareholder of Morris Inc. stock. Further, Bill III is and was throughout the Relevant Period a party in interest to the Plan under 29 U.S.C. §§ 1002(F) as a "relative," within the meaning of 29 U.S.C. § 1002(15), of Doris Morris and Randy Clapsadl.

25.     Bill III resides or may be found in this District, as he works at the Company in Garner, North Carolina, and resides in Raleigh, North Carolina.

26.     Defendant Doris Morris is Bill III's wife and is Payroll Manager at the Company. She is and was throughout the Relevant Period an owner of Morris Inc. common stock.

27.     Doris Morris is and was throughout the Relevant Period a Plan Trustee. Accordingly, she was a fiduciary to the Plan in the Relevant Period. Doris Morris was also a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A) when she exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets,

and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

28. As Plan Trustee, Doris Morris is and was throughout the Relevant Period a "named fiduciary," within the meaning of 29 U.S.C. § 1102(a), under the terms of the written instruments under which the Plan was established and maintained.

29. Doris Morris is and was throughout the Relevant Period a party in interest to the Plan under 29 U.S.C. §§ 1002(14)(A), (F), and (H), as a fiduciary, employee, and "relative," within the meaning of 29 U.S.C. § 1002(15), of Bill III and Randy Clapsadl.

30. Doris Morris resides or may be found in this District, as she works at the Company in Garner, North Carolina, and resides in Raleigh, North Carolina.

31. Defendant Randy Clapsadl is Bill III's son-in-law and is the Company's President. He was a Company officer throughout the Relevant Period, previously as the Company's Executive General Manager, Senior Vice President, and Chief Revenue Officer (CRO). He is married to Sarah M. Clapsadl, a shareholder of Morris Inc. common stock and the Company's Secretary and Senior Accounting Manager in the Relevant Period.

32. Randy Clapsadl is, and was throughout the Relevant Period, a Plan Trustee. Accordingly, he was a fiduciary to the Plan in the Relevant Period. He was also a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A) when he exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

9

33.     As Plan Trustee, Randy Clapsadl is, and was throughout the Relevant Period, a "named fiduciary," within the meaning of 29 U.S.C. § 1102(a), under the terms of the written instruments under which the Plan was established and maintained.

34.     Randy Clapsadl is, and was throughout the Relevant Period, a party in interest to the Plan under 29 U.S.C. §§ 1002(14)(A), (F), and (H), as a fiduciary, officer, and/or "relative," within the meaning of 29 U.S.C. § 1002(15), of Bill III and Doris Morris.

35.     Randy Clapsadl resides or may be found in this District, as he works at the Company in Garner, North Carolina, and resides in Raleigh, North Carolina.

36.     Defendant Robert ("Bob") F. Warwick is, and was since November 2018, a Plan Trustee. Accordingly, he was a fiduciary to the Plan in the Relevant Period.

37.     Warwick was also a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A) when he exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

38.     As Plan Trustee, Warwick is, and was since November 2018, a "named fiduciary," within the meaning of 29 U.S.C. § 1102(a), under the terms of the written instruments under which the Plan was established and maintained.

39.     Warwick is and was since November 2018 a party in interest to the Plan under 29 U.S.C. §§ 1002(14)(A) as a fiduciary.

40.     Warwick resides or may be found in this District, as he works at CAPTRUST in Wilmington, North Carolina, and resides there as well.

**D.     Board Defendants**

41.     Defendants Bill III, Bruce Bowers, John Kimber, Ned Leary, Ed Leonard and John Shell constitute the Morris Inc. Board of Directors.

42.     As Directors, the Board Defendants are parties in interest to the Plan and act as functional fiduciaries to the Plan in their May 3, 2023 decision to remove Plaintiff from his position on the ESOP Committee and as Trustee.

43.     The Board Defendants reside or may be found in this District as Board meetings are held in this District, at the residence of Bill III.

<u>FACTUAL ALLEGATIONS</u>

**A.     Company and Plan Background**

44.     Headquartered in Garner, North Carolina, Morris Inc. designs and manufactures high performance chilling, refrigeration, and ice production equipment. It has approximately 130 permanent employees in the United States, as well as approximately 20 contract employees working in the United States and internationally. As of December 31, 2021, 123 current and former employees (and beneficiaries) participated in Morris Inc.'s ESOP, and were receiving or entitled to receive benefits.

45.     Morris Inc. was founded by W.F. Morris, Jr., L.R. Gorrell, and A.L. Purrington, Jr. (the "Founders"), and incorporated in North Carolina in January 1949, as Morris and Gorrell, Inc. The 2002 retirement of W.F. Morris, Jr. triggered the 2003 reorganization of the company from an S-Corp to a C-Corp and the formation of the

11

ESOP to acquire Morris Inc. common stock from W.F. Morris, Jr. and C.R. Farinholt, while leaving Defendant Bill III with a controlling ownership interest. Beginning in 2003, the Plan periodically purchased shares of the Company, becoming the majority shareholder in 2010.

46. The effective date of the Plan was January 1, 2003. The Plan has been periodically amended through resolutions by the Board. For purposes of the allegations herein concerning the Relevant Period, the effective plan document is the Morris & Associates, Inc. Employee Stock Ownership Plan as Amended and Restated, which was effective on January 1, 2017, and executed on January 27, 2017 (hereafter, the "Plan Document"). The Trust Agreement was made January 19, 2011, to create the ESOP Trust. The Plan includes the Plan Document as well as the Trust Agreement, unless the context indicates otherwise. Plan Doc. § 2.37.

47. The Plan is intended to be an employee stock ownership plan, or ESOP, within the meaning of 26 U.S.C. § 4975(e)(7) and 29 U.S.C. § 1107(d)(6). By its terms, "[t]he Plan is designed to invest primarily in Company Stock," and its purpose "is to enable participating Employees to share in the growth and prosperity of the Company, and to provide Participants with an opportunity to accumulate capital for their future economic security." Plan Doc. § 1.01. The Plan is an "individual account plan" or "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2).

48. Under the Plan Document, "All … Plan assets will be held in the Trust by the Trustee in accordance with the provisions of the Trust Agreement," and said Trustee

12

is "[t]he person(s) or other entity designated by the Board (and any successor Trustee) which agrees to serve by executing the Trust Agreement." Plan Doc. §§ 1.04, 2.47. The Plan provides that the Trustee has "the sole responsibility" to value Plan assets in the Plan's trust at fair market value. Plan Doc. §§ 2.48, 11.03. Where, as here, there is no generally recognized market for the stock of the privately-held Morris Inc., "the determination of fair market value of Company Stock for all purposes under the Plan shall be made by the Trustee based upon the value determined by an independent appraiser that meets the requirements similar to the requirements of the Treasury Regulations prescribed under Internal Revenue Code §170(a)(1) and who is recognized as having expertise in rendering such evaluations." Plan Doc. § 5.03.

49. The Plan's Named Fiduciaries are: "the Board of Directors of the Employer, the Committee, the Plan Administrator, and the Trustee." Plan Doc. § 11.01.

50. All current shareholders of Morris Inc. other than the Plan are relatives of the Founders. The Plan holds 73,134 shares (75.1% of all outstanding shares), and various Morris family members and family trusts hold and held in the Relevant Period all remaining shares (24.9% of Morris Inc. shares).

51. From 2008 to 2012, the only Trustees to the Plan were Plaintiff Johns and Defendant Bill III. In October 2012, the Board appointed Defendant Doris Morris and Defendant Randy Clapsadl (the wife and son-in-law, respectively, of Bill III) as additional Trustees. In November 2018, Defendant Bob Warwick, a long-time business partner of Bill III, replaced Bill III as a Plan Trustee upon his resignation from that role.

13

52.     The Plan currently has four Trustees, two of whom are members of the Morris family, and the third of which is a long-time business partner of Bill III. Plaintiff is the only Trustee who is independent from the Morris family.

53.     During the Relevant Period, May 2017 to the present, Bill III was the CEO of Morris Inc. and the Chairman of Morris Inc.'s Board of Directors ("Board"). The other Board members at various times during the Relevant Period have been Bruce N. Bowers, Edgar W. Leonard, Blake D. Lovette, Samuel H. Maw, Robert M. Webb, John Shell, Ned Leary, and John Kimber. Bill III had the power throughout the Relevant Period to hire and fire Plaintiff Johns. The Board has the power to remove and to appoint ESOP Trustees.

54.     During the Relevant Period, Plaintiff Johns, a non-Morris family member and the Company's President until December 2021 and its COO until on or about April 24, 2023, was a direct report to Bill III. Randy Clapsadl, Bill III's son-in-law and the Company's Senior Vice President and CRO, was another direct report to Bill III, beginning in or about 2020. In December 2021, Bill III announced the Board's leadership succession plan: Johns would transition to being only COO, while Randy Clapsadl would become President and the next leader of Morris Inc.

55.     At that time, December 2021, Plaintiff Johns and Defendant Clapsadl were lauded by Bill III, who expressed his intention that they lead Morris Inc. into the future. Bill III stated at the Quarterly Meeting to employees, *inter alia*:

> "Bryan Johns has served ably and diligently in this role [President] for 10 years and, now continuing in his critical role as Chief Operating Officer, he will be able

14

to devote his attention more to the operations side of the business and the internal growth and expansion necessary to support our quickly expanding LineGuard Service plan initiative and our growing Thermal Solutions business unit, now called Morris 360. All of us, and especially me personally, owe Bryan a great debt of gratitude for his excellent leadership and mentoring on behalf of the Morris team and company, and look forward to it continuing into the future."

56.     Plaintiff is qualified for his position as COO at Morris Inc.

57.     On or about April 24, 2023, Bill III informed Johns that he was terminated from employment with Morris Inc.

58.     Bill III terminated Johns because Johns, in his capacity as Trustee for the ESOP, repeatedly raised concerns about the annual valuations of the ESOP's Morris Inc. stock and the administration of the ESOP. In an email message Bill III sent to Johns on April 24, 2023, to which was attached a proposed severance agreement, it is apparent that Bill III terminated Johns because Johns was seeking to protect the interests of the ESOP and its participants. Among other things, due to the valuator's failure to include cash and other assets in the value of Morris Inc. stock, Plan participants who separated from service were receiving well below fair market value for their shares of Morris Inc.

59.     Bill III was and is running Morris Inc. as a Morris-family-owned business, not as an ESOP-owned company. For example, Annual Board Meetings were held at Bill III's home and were preceded by dinners, also at Bill III's home. The Company's charitable contributions, which reduced the value of the ESOP, were directed by Bill III and his wife. Meanwhile, upon information and belief, Morris family members were

15

frequently paid above-market salaries, in contrast to non-Morris family employees and, in the case of Bill III, that salary is guaranteed, even after death.

60.     Bill III took actions as a named and functional Plan fiduciary against the interests of the ESOP and its participants and beneficiaries. His discharge of Johns from his employment as COO was one of those actions. Neither the other Trustee Defendants nor the other Company Directors, who are related to and otherwise associated with or beholden to Bill III, have met their duties to protect the ESOP and the ESOP-owned Company.

61.     Plaintiff is a duly appointed Plan Trustee and a signatory to the Trust Agreement. Plaintiff has not been provided notice of his removal as Plan Trustee, but by letter dated May 5, 2023, from attorney Press Millen of Womble Bond Dickinson (US) LLP, was notified the Board removed him from the ESOP Administrative Committee, by Written Consent dated May 3, 2023, to take effect 60 days after his receipt of notice, pursuant to the Plan. The Committee and the Trustees are different entities with different roles with respect to the Plan under the Plan's governing documents.

### B.     The Mis-Valuation of the ESOP's Stock

62.     The Plan, consistent with ERISA, requires annual valuations by the Trustees to determine the "fair market value" of the Morris Inc. shares held in the ESOP Trust as of the valuation date. Plan Doc. §§ 2.48, 5.03, 11.03.

63.     Annually, Bill III hired Crescent Valuation Advisors, LLC ("Crescent") to appraise the value of the ESOP's common stock interest in the Company. In each case, the valuation was done by John J. Sudol. Crescent's engagement letters were sent to "Mr.

William F. Morris, III, ESOP Trustee" even after Bill III resigned and was replaced as a Plan Trustee and had no authority to engage a valuator for the Plan. Nonetheless, Bill III signed Crescent engagement agreements. Bill III usurped the Trustees' responsibility and functioned as a discretionary Plan fiduciary after his replacement as Trustee.

64.     In preparing his valuations, Sudol discussed and reviewed the Company's financial statements, future earnings and capital expenditure projections, and valuation assumptions for the ESOP only with Bill III and Bill III's daughter, Sarah Clapsadl. Sudol did not receive or consider any information or materials from anyone at the Company other than these two individuals, nor did he speak with Plan Trustee and Company officer Johns.

65.     The valuation as of December 31, 2016 appraised Morris Inc. at $14,801,000 enterprise value. After applying a 5% discount for lack of marketability, each share was valued at $144.40.

66.     This valuation suffered from numerous flaws which undervalued the shares owned by the ESOP. Among them: (a) the Company had over $40 million in total assets including $23.2 million in cash equivalents and only $9.1 million in liabilities; (b) the Company was profitable as a going concern, with EBITDAs exceeding $7 million in the prior year; (c) the Company's net sales and gross profits were steadily increasing at a 13.2% annual growth rate over the prior 5 years for net sales and 17.7% annual growth rate for gross profits; (d) after consultation with Bill III, the valuation applied a growth rate of only 2%, less than projected inflation or GDP growth, and projected that based on a weighted average of the prior five years of sales, meaning that despite double digit sales

growth in each of the prior five years, the valuation assumed net sales would drop from $45.5 million to below $40.9 million the following year.

67.     Thus, although the Company was profitable and growing, the 2016 Valuation appraised Morris Inc. with enterprise value of $14,801,000, which was less than the cash in the Company's bank accounts and less than the liquidation value of the Company.

68.     The valuation as of December 31, 2017 appraised Morris Inc. at $18,671,000 enterprise value. After applying a 5% discount for lack of marketability, each share was valued at $182.00.

69.     This valuation suffered from numerous flaws which undervalued the shares owned by the ESOP. Among them: (a) the Company had over $50 million in total assets including $30.3 million in cash equivalents and only $12.6 million in liabilities; (b) the Company was profitable as a going concern, with EBITDAs exceeding $4 million per year in each of the prior five years; (c) after consultation with Bill III, the valuation assumed 1% growth in net sales over the long term even though inflation and GDP growth was expected to exceed 2% over the next 10 years and even though the Company's long-term growth rate exceeded the rates of inflation and GDP growth.

70.     Thus, although the Company was profitable and growing, Morris Inc. was appraised at an enterprise value of $18,671,000, which was less than the cash in the Company's bank accounts and less than the liquidation value of the Company.

71.     The valuation as of December 31, 2018 appraised Morris Inc. at $20,005,000 enterprise value. After applying a 5% discount for lack of marketability, each share was valued at $195.00.

72.     This valuation suffered from numerous flaws which undervalued the shares owned by the ESOP. Among them: (a) the Company had over $58.6 million in total assets including $37.7 million in cash equivalents and only $19.5 million in liabilities; (b) the Company was profitable as a going concern, with EBITDAs exceeding $4 million per year in each of the prior five years, and $7.2 million for the latest fiscal year; (c) after consultation with Bill III, the valuation assumed 2% growth in net sales over the long term even though inflation and GDP growth was expected to exceed 2% over the next 10 years and even though the Company's long-term growth rate exceeded the rates of inflation and GDP growth.

73.     Thus, although the Company was profitable and growing, Morris Inc. was appraised at an enterprise value of $20,005,000, which was less than the cash in the Company's bank accounts and less than the liquidation value of the Company.

74.     The 2020 Valuation contains many flaws and unreasonable assumptions when valuing the shares in the ESOP. It valued the ESOP's Morris Inc. stock at $161.60 per share, based on an enterprise value of $16,560,000.

75.     As of December 31, 2020, however, the Company was sitting on over $38 million in cash, with total assets of $57,629,365. Meanwhile, total liabilities were $12,058,651. In other words, if the Company simply stopped doing business and liquidated its assets, it would have distributed over $45 million to shareholders. The

19

ESOP would receive 75.1% of such a distribution, about $33,750,000. But the Company reported a value of only $11,818,454 for the ESOP's Morris Inc. shares.

76.     For the 2020 valuation, Bill III had represented that growth was expected to be 2% per year even though inflation and real GDP growth were projected to be substantially higher and despite the fact the EBITDA continued to exceed $4 million per year and any decline in net sales could be directly attributed to the COVID-19 pandemic and its resulting shut-downs.

77.     In other words, this was a growing and consistently profitable company worth far more than its liquidation value, not a tiny fraction of the liquidation value.

78.     The 2021 Valuation Report, issued on September 15, 2022, contained many of the same flaws while valuing each share at $179.90 and the enterprise as a whole at $18,437,000 ($17,516,000 after accounting for shareholder lack of marketability).

79.     In a single year, Net Sales had increased 8.4% to $38.6 million, Gross Profit had increased 9% to $16.9 million, and EBITDA has increased 14% to $4.9 million. In other words, the Company was significantly more profitable and growing far higher than the 2% estimate given in 2020.

80.     Meanwhile, the Company's cash holdings had grown to $42.8 million, reflecting a 5-year average growth rate of 9.0% annually. Total assets increased to $62.9 million. And, while Total Liabilities had increased to $15.3 million, the liquidation value of the company now stood at $47.6 million, while sales and profits continued to grow.

81.     Again, the valuation accepted future growth rates below inflation and GDP growth, even though the Company had a demonstrated history of growth exceeding those rates.

82.     While the 2022 Valuation is not yet complete, the errors of prior valuations, if continued, would become even more significant. As of December 31, 2022, total assets had jumped from $62,274,529.18 the year prior to $84,222,363.06, with $56.5 million of the total assets being in cash. Although liabilities had also increased, assets now exceeded liabilities by $53.3 million and the balance sheet now reflected $52.7 million in Retained Earnings.

83.     Although conversations with a Morris family member led the 2021 Valuation to assume a 2% annual growth rate (less than GDP growth or inflation), the 2020 Gross Sales increased by over 43% and total net income more than doubled.

84.     This growth was widely known by the Morris family generally, including Sarah Clapsadl—the Company's Senior Accounting Manager and the wife of Randy Clapsadl and daughter of Bill III—months before the 2021 Valuation, and prior to Sudol, the valuator, discussing and reviewing future earnings, projections, and assumptions in preparation for the 2021 valuation. Sarah Clapsadl attended the April 19, 2022 Board meeting, which discussed that a second shift had been added and the Company was "running at about a $70 million rate per year" in light of "larger bookings" year to date.

85.     At the same April 2022 meeting, the Board approved purchases of Morris Inc. stock by the Morris family, including Bill III purchasing all of Shannon M. Fox's

1,200 shares and his sale of 400 shares each to Sarah Clapsadl and his son, William Morris, IV ("Bill IV").

### C. Bill III Repeatedly Caused the ESOP to Undervalue its Morris Inc. Stock

86.     Crescent was engaged by Bill III, acting as Trustee to the ESOP even after his replacement in November 2018, to value the Morris Inc. stock held by the Plan annually during the Relevant Period. Plaintiff, a co-Trustee, did not approve the engagement.

87.     To gain an understanding of the operations of Morris Inc., John J. Sudol, Managing Member of Crescent, met with Bill III on June 23, 2015, for a site visit of the Company's operations.

88.     After the 2015 site visit, neither Sudol, nor anyone else at Crescent, visited Morris Inc. At no time did Sudol meet with or discuss his valuation and assumptions with Johns or anyone else at Morris Inc. or anyone responsible for the ESOP who was not a member of the Morris family.

89.     As a condition of Crescent's engagement, the ESOP's Trustees and the Company, of which the ESOP owned a majority of shares, were required to provide all information relating to Morris Inc. necessary for purposes of Crescent providing its "opinion of the fair market value of the ESOP's single share to the Trustees." In providing the valuations, Crescent would assume the accuracy, reliability, and completeness of all information, which was furnished by Bill III and Sarah Clapsadl, without any independent verification, audit, or review.

22

**D.    Bill III Has Repeatedly Placed His and His Family's Economic Interests Ahead of the ESOP and Caused the ESOP Financial Harm**

90.    The ESOP's Morris Inc. stock was directly impacted by the actions described below.

91.    Any payment of excessive compensation in any form lowered the ESOP's value by increasing expenses and therefore reducing margins. EBITDA margins are one of the key inputs to valuing a private company.

92.    As fiduciaries to the ESOP, Defendants had a duty to protect the ESOP from such losses. They did not.

93.    Excessive compensation was paid to Bill III throughout the Relevant Period.

94.    As CEO, Bill III's compensation was set by the Board, which included only Bill III's friends and business associates. The Board, thus, had no independent directors.

95.    The Board did not commission executive compensation studies to evaluate the compensation paid by Morris Inc. to Bill III (or anyone else) and there was no executive compensation committee.

96.    Holding, as he did, the proxies of minority shareholders and being himself the largest shareholder besides the ESOP, and populating the Board with friends and business associates who were biased towards him and sometimes simply asleep at the wheel, while at the same time controlling the ESOP via his status as a Trustee and later as a functional fiduciary and close relative or business-associate of three Trustees, Bill III

23

Case 5:23-cv-00324-D-RJ   Document 1   Filed 06/16/23   Page 23 of 40

**D.    Bill III Has Repeatedly Placed His and His Family's Economic Interests Ahead of the ESOP and Caused the ESOP Financial Harm**

90.    The ESOP's Morris Inc. stock was directly impacted by the actions described below.

91.    Any payment of excessive compensation in any form lowered the ESOP's value by increasing expenses and therefore reducing margins. EBITDA margins are one of the key inputs to valuing a private company.

92.    As fiduciaries to the ESOP, Defendants had a duty to protect the ESOP from such losses. They did not.

93.    Excessive compensation was paid to Bill III throughout the Relevant Period.

94.    As CEO, Bill III's compensation was set by the Board, which included only Bill III's friends and business associates. The Board, thus, had no independent directors.

95.    The Board did not commission executive compensation studies to evaluate the compensation paid by Morris Inc. to Bill III (or anyone else) and there was no executive compensation committee.

96.    Holding, as he did, the proxies of minority shareholders and being himself the largest shareholder besides the ESOP, and populating the Board with friends and business associates who were biased towards him and sometimes simply asleep at the wheel, while at the same time controlling the ESOP via his status as a Trustee and later as a functional fiduciary and close relative or business-associate of three Trustees, Bill III

23

had unfettered and unilateral control over his own compensation, with no oversight by the ESOP or any independent person.

97.     As a fiduciary and Trustee of the ESOP, which was the majority shareholder of Morris Inc. in the Relevant Period, Bill III did not separately evaluate the reasonableness of his compensation, nor did he permit other Trustees to undertake such an assessment while he was a Trustee or after.

98.     At the request of Bill III, Bill III's compensation, and the compensation of other officers, was not itemized or identified in the ESOP's annual valuation reports.

99.     Bill III received excessive compensation during each year, which increased Morris' expenses, decreased its profitability, and further reduced the valuation of the Company, including by projecting future excessive compensation.

100.    In all relevant years, Bill III received bonus compensation exceeding the total amount of all bonuses paid to all other managers at Morris, Inc.

101.    In 2016, Bill III received $2,072,665 in bonuses while the other 49 managers received a combined $1,025,023.

102.    In 2017, Bill III received $1,364,765 in bonuses while the other 56 managers split $922,272.

103.    In 2018, Bill III received $1,869,560 in bonuses while the other 58 managers split $1,099,950.

104.    In 2019, Bill III received $1,177,690 in bonuses while the other 56 managers split $860,225.

105. In 2020, Bill III received $904,750 in bonuses while the other 56 managers split $677,000.

106. In 2021, Bill III received $909,430 in bonuses while the other 65 managers split $741,370.

107. In 2022, Bill III received $2,476,159 in bonuses while the other 66 managers split $1,155,445. In other words, 68.2% of the total bonus pool for 67 employees went to Bill III.

108. In addition to the bonus compensation, Bill III received a generous salary that was not reviewed, approved, or benchmarked by the ESOP Trustee.

109. Furthermore, Bill III has routinely used corporate money to pay for his estate planning. This improper use of corporate funds diminishes the value of the ESOP's Morris Inc. stock because those monies should have been invested in Company operations, capital investment, or used as dividends to shareholders.

110. Any excessive compensation paid to Bill III impacted the value of the Morris Inc. stock owned by the ESOP because company expenses and liabilities lower equity value.

111. Bill III has also managed the stock dividends to benefit him and his family at the expense of the ESOP. During the relevant period, Bill III directed changes to the dividend program, which allowed Morris family members, as the minority shareholders, to receive cash dividends while the ESOP merely used the dividends to meet annual share purchase obligations.

112.    The other Trustees knew of the excessive compensation to Bill III and misuse of Company assets, as Randy Clapsadl was an officer, including Company President, in the Relevant Period; Doris Morris was Bill III's wife, a shareholder of Morris Inc., and Payroll Manager; and Warwick attended Board meetings.

**E.    Bill III interfered with Plaintiff's Execution of His Duties as Trustee**

113.    At the direction of Bill III, Plaintiff was not interviewed by any valuation provider, asked to provide information to be used in the valuation, or allowed to question the valuation provider.

114.    The Board of Morris, Inc. voted to remove Plaintiff as a member of the ESOP Committee effective July, 2023.

115.    While Plaintiff continues to serve as Trustee of the ESOP, he was scheduled to attend, at cost to the Company and, therefore, the ESOP, the TEA National Conference in Washington, DC May 16–19, 2023, which is hosted by The ESOP Association.

116.    On May 5, 2023, Defendant Randy Clapsadl directed the ESOP Association and host hotel to cancel Plaintiff's registration and hotel room, respectively, despite Plaintiff's continued service to the Plan's Committee and as Trustee.

## CLAIMS FOR RELIEF

## COUNT I

**Breaches of Fiduciary Duty Under 29 U.S.C. § 1104(a)(1) Against The Trustee Defendants and Morris Inc. for Causing and Allowing Inaccurate Valuations**

117.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

118.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires, *inter alia*, that a plan fiduciary discharge his or her or its duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan and defraying reasonable expenses of administering the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (C) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with ERISA.

119.    The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

120.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and to restore to the plan any profits of the fiduciary which have been made through the use of assets of the plan by the fiduciary, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

27

121. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits plan participants, beneficiaries, and fiduciaries to bring a suit for relief to a plan under ERISA § 409. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), further permits plan participants, beneficiaries, and fiduciaries to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

122. The Trustee Defendants were required to undertake appropriate and independent investigations of the fair market value of Morris Inc. stock in the Relevant Period in order to fulfill their fiduciary duties, and an appropriate investigation would have revealed that the valuations made by Crescent did not reflect the fair market value of the Morris Inc. stock owned by the Plan.

123. The Trustee Defendants as fiduciary Trustees, Defendant Bill III as a functional fiduciary after his resignation as Trustee, and Defendant Morris Inc. as the Plan Administrator fiduciary that supplied information to Crescent, had a duty to provide the valuator complete and accurate information to conduct the valuations. Defendants failed to do so.

124. The Trustee Defendants had the responsibility and duty to value the Plan's stock, investigate the valuator's qualifications, hire a qualified valuator, provide the valuator with complete and accurate information, and make certain that reliance on the valuator's advice was reasonably justified under the circumstance. But the Trustee Defendants failed to do so in the Relevant Period, and after Bill III resigned as Trustee,

28

Doris Morris, Randy Clapsadl, and Bob Warwick allowed Bill III to usurp their role and hire a valuator that undervalued the ESOP's stock. Bill III controlled and directed the supply of information from the Company to Crescent, on which the valuator undervalued the Company. The Trustee Defendants did not meet their duties of care, skill, prudence, diligence, and loyalty to the Plan and its participants and beneficiaries.

125.    The Trustee Defendants had a duty of loyalty under which they should have discharged their duties with respect to the ESOP solely in the interest of its participants and beneficiaries. Instead, they allowed the interests of Bill III and the Morris family to interfere with their duties, and imprudently did not seek Plaintiff's input as co-Trustee, allowing Bill III to largely work alone on valuation, and at times with his wife, son-in-law, and daughter, with the undervaluation of ESOP's stock as a result.

126.    The Trustee Defendants and Morris Inc. breached their fiduciary duties under 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D).

127.    The Trustee Defendants and Morris Inc. caused losses to the Plan and its participants and beneficiaries, for which they are liable, by their breaches of fiduciary duty, in an amount to be proved specifically at trial, and are subject to equitable relief, including an order enjoining them from conducting flawed valuations and removal as fiduciaries, and other equitable or remedial relief as appropriate.

## COUNT II

**Breaches of Fiduciary Duty Under 29 U.S.C. § 1104(a)(1) Against The Trustee Defendants and Morris Inc. for Allowing Use of Corporate Assets for Personal Benefit and Excessive Compensation**

128.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

29

129.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires, *inter alia*, that a plan fiduciary discharge his or her or its duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan and defraying reasonable expenses of administering the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (C) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with ERISA.

130.    The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

131.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and to restore to the plan any profits of the fiduciary which have been made through the use of assets of the plan by the fiduciary, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

132.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participants, beneficiaries, and fiduciaries to bring a suit for relief to a plan under ERISA § 409. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), further permits plan participants, beneficiaries, and fiduciaries to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

133.    Bill III and Morris Inc. were fiduciaries under 29 U.S.C. §§ 1002(16)(A), 1002(21), and 1102(a), that caused the ESOP financial harm by diminishing the value of Morris Inc. stock where they caused Bill III to receive excessive compensation and allowed Bill III to use corporate money for his own benefit, such as for his personal estate planning.

134.    The Trustee Defendants are and in the Relevant Period were the fiduciaries controlling the ESOP Trust, which was the majority shareholder of Morris Inc. The Trustee Defendants had knowledge of the misuse of assets of the ESOP-owned Company, but did not take action within the scope of their authority as majority shareholder to prevent, stop, and rectify it.

135.    Defendants caused and allowed losses to the Plan and its participants and beneficiaries, for which they are liable, by their breaches of fiduciary duty, in an amount to be proved specifically at trial, and are subject to equitable relief, including an order enjoining them from causing Bill III to receive excessive compensation and use corporate

money for his own benefit and removal as fiduciaries, and other equitable or remedial

relief as appropriate.

## COUNT III

**Breaches of Fiduciary Duty Under 29 U.S.C. § 1104(a)(1) Against The Trustee
Defendants and Morris Inc. for Managing the ESOP and the Company for the
Benefit of Bill III and his Family at the Expense of the ESOP and its Participants**

136.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

137.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires, *inter alia*, that a plan

fiduciary discharge his or her or its duties with respect to a plan solely in the interest of

the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to

participants and the beneficiaries of the plan and defraying reasonable expenses of

administering the plan, (B) with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent person acting in a like capacity and familiar

with such matters would use in the conduct of an enterprise of a like character and with

like aims, and (C) in accordance with the documents and instruments governing the plan

insofar as such documents and instruments are consistent with ERISA.

138.    The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and

to resolve them promptly when they occur. A fiduciary must always administer a plan

with an "eye single" to the interests of the participants and beneficiaries, regardless of the

interests of the fiduciaries themselves or the plan sponsor.

139.    ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who

is a fiduciary with respect to a plan and who breaches any of the responsibilities,

obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally

32

liable to make good to the plan any losses to the plan resulting from each such breach, and to restore to the plan any profits of the fiduciary which have been made through the use of assets of the plan by the fiduciary, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

140.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participants, beneficiaries, and fiduciaries to bring a suit for relief to a plan under ERISA § 409. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), further permits plan participants, beneficiaries, and fiduciaries to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

141.    Defendants administered the ESOP and managed the Company to benefit Bill III's and his family's interests at the expense of the ESOP and its participants. In doing so, they violated the highest duty known to the law—a fiduciary's duty of loyalty.

142.    The corporate and ESOP governance structures implemented and maintained by Bill III, with his placement of relatives, friends, and business associates in Trustee and Director positions, ensured his complete and unfettered control over Morris Inc. and the ESOP, even though the ESOP was the majority shareholder, and even though the ESOP was an entity independent of the Morris family and should have been administered solely in the interest of participants and beneficiaries.

143.    Because the Company cannot act but through its Board, Bill III ensured his control of Morris Inc. by controlling its Board via proxies and his status Chairman of the Board, and as Trustee for the ESOP, the largest shareholder, and then as a functional fiduciary controlling the Trustee through his relatives and business partner, Doris Morris, Randy Clapsadl, and Bob Warwick.

144.    Bill III used his control over Morris Inc. and the ESOP to:

   a.  routinely cause the ESOP to receive valuations that greatly understated the fair market value of the ESOP's Morris Inc. stock;

   b.  pay himself excessive compensation;

   c.  use corporate assets for his own benefit such as paying estate planning expenses; and

   d.  hire and pay multiple family members from Company assets.

145.    Defendants other than Bill III did not use their authority as Trustees of the ESOP Trust, the majority shareholder, and as the fiduciary Plan Administrator, Plan Sponsor, and employer, to prevent, stop, or rectify Bill III's malfeasance.

146.    Defendants caused and allowed losses to the Plan and its participants and beneficiaries, for which they are liable, by their breaches of fiduciary duty, in an amount to be proved specifically at trial, and are subject to equitable relief, including removal as fiduciaries, appointment of independent Trustees who with Plaintiff will select new Company Directors and a Chairman of the Board to the extent the Trust is allowed as majority shareholder, and other equitable or remedial relief as appropriate.

## COUNT IV

**Interference with Protected Rights in Violation of 29 U.S.C. § 1140
Against William F. Morris III, Morris Inc. and the Board Defendants**

147.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

148.    Section 510 of ERISA provides, in relevant part: "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, [or] this title … or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, [or] this title … The provisions of section 502 shall be applicable in the enforcement of this section." 29 U.S.C. § 1140.

149.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits plan participants, beneficiaries, and fiduciaries to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

150.    Bill III and Morris Inc. unlawfully and intentionally discriminated against and discharged Plaintiff for exercising his rights and responsibilities to protect the Plan, the ESOP Trust, and Plan participants and beneficiaries pursuant to ERISA's fiduciary duty and trustee provisions, *see* 29 U.S.C. §§ 1103(a), 1103(c)(1), 1104(a)(1), and pursuant to the Plan's governing documents. Bill III and Morris Inc. unlawfully and intentionally discriminated against and discharged Plaintiff to interfere with ESOP

participants' and beneficiaries' rights to receive a fair market value distribution from their Plan accounts holding Morris Inc. stock.

151. Bill III and Morris Inc. unlawfully discharged Plaintiff from his position as Company COO; unlawfully withheld salary due Plaintiff and interfered with his health, ESOP, and other benefits; and unlawfully acted to discharge Plaintiff from his role as a Plan fiduciary.

152. The Board Defendants unlawfully acted to remove Plaintiff as a Member of the ESOP Committee, which removal they intend to be effective as of July 2, 2023.

153. Plaintiff is an ESOP participant who was recently discharged from employment, and as such will receive a distribution from the Plan pursuant to its terms. As alleged herein, Plaintiff's distribution from the Plan will be at less than fair market value under the present undervaluation of Company stock. Bill III and Morris Inc.'s intentional interference with Plaintiff's efforts to protect the Plan and participants and beneficiaries generally interferes with Plaintiff's own attainment of benefits under the ESOP, as one of the approximately 123 Plan participants.

154. Bill III and Morris Inc. are subject to appropriate equitable relief including an order to reinstate Plaintiff to his position as COO at Morris Inc.; restitution, disgorgement, surcharge, and other injunctive and equitable relief to redress the denial to Plaintiff of salary and benefits which he would have received but for the unlawful discharge and discrimination, including but not limited to stock allocations which would accrue to his Plan account at year-end 2023 but for the interference with his attainment of 1,000 or more hours of service with the Company in the 2023 Plan year; reinstatement to

36

any fiduciary position of which Plaintiff was or will be discharged as a result of the unlawful discrimination and interference with his protected rights under ERISA and the Plan's governing documents; an injunction against removal of Plaintiff from his position as Plan Trustee due to unlawful discrimination and interference with his protected rights under ERISA and the Plan's governing documents; and other appropriate equitable relief.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment against Defendants and for the following relief:

A.    That the Court declare that Defendants breached their fiduciary duties under ERISA;

B.    That the Court order each Defendant found to have violated ERISA to jointly and severally make good to the Plan those losses resulting from the breaches of ERISA and restore any profits they made in violation of ERISA;

C.    That the Court order Defendants to provide other appropriate equitable relief to the Plan, and any successor trust, and its participants and beneficiaries, including but not limited to surcharge, providing an accounting for profits, and imposing a constructive trust and/or equitable lien on any funds wrongfully held by Defendants;

D.    That the Court order the proceeds of any recovery for the Plan, and any successor trust, to be allocated to the accounts of the Plan Participants to

make them whole for any injury that they suffered as a result of the breaches of ERISA in accordance with the Court's declaration;

E.      That the Court order the removal of any of the breaching fiduciaries from their positions as fiduciaries for the Plan and enjoin any of the breaching fiduciaries from acting as fiduciaries for any plan that covers any Morris Inc. employees;

F.      That the Court appoint independent Plan trustees to work with Plaintiff Johns to act as ESOP Trustee and, as majority shareholder, to replace the incumbent and conflicted Board and Board Chairman with an independent Board and Chairman, to the extent allowed by the Plan's 75.1% ownership interest;

G.      That the Court order (1) a constructive trust be placed on any proceeds resulting from the breaches, (2) disgorgement of profits made by a breaching fiduciary or party in interest resulting or other person from the breaches, and/or (3) any other appropriate equitable relief against a breaching fiduciary or party in interest resulting from the breaches, whichever is in the best interest of the Plan;

H.      That the Court order, pursuant to 29 U.S.C. § 1056(d)(4), that any amount to be paid to the Plan accounts can be satisfied by using or transferring any breaching fiduciary's ESOP account in the Plan (or the proceeds of that account) to the extent of that fiduciary's liability;

38

I.    That the Court order Plaintiff's reinstatement as COO at Morris Inc., equitable relief making him whole for lost wages and benefits caused by unlawful discrimination and discharge, and enjoin his removal from any position as Plan fiduciary;

J.    That the Court award Plaintiff reasonable attorneys' fees and costs of suit incurred herein pursuant to 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund;

K.    That the Court order Defendants to pay pre-judgment and post-judgment interest; and

L.    That the Court award such other and further relief as the Court deems equitable and just.

Case 5:23-cv-00324-D-RJ   Document 1   Filed 06/16/23   Page 39 of 40

Dated:    June 16, 2023

Respectfully submitted,

*/s/ Alan B. Felts*
J. Nathan Duggins III
N.C. State Bar No. 22029
Denis E. Jacobson
N.C. State Bar No. 13559
Alan B. Felts
N.C. State Bar No. 42826
**TUGGLE DUGGINS P.A.**
400 Bellemeade Street, Ste. 800
Greensboro, NC  27401
Telephone: (336) 378-1431
Facsimile: (336) 274-6590
NDuggins@tuggleduggins.com
DJacobson@tuggleduggins.com
AFelts@tuggleduggins.com

Gregory Y. Porter (*pro hac vice to be filed*)
Mark G. Boyko (*pro hac vice to be filed*)
David A. Felice (*pro hac vice to be filed*)
**BAILEY & GLASSER LLP**
1055 Thomas Jefferson Street, NW, Ste. 540
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
gporter@baileyglasser.com
mboyko@baileyglasser.com
dfelice@baileyglasser.com

*Attorneys for Plaintiff*