**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**Civil Action No. 5:23-CV-00324**

| | |
|---|---|
| BRYAN J. JOHNS, individually and on behalf of the Morris & Associates, Inc. Employee Stock Ownership Plan, <br><br> Plaintiff, <br><br> v. <br><br> WILLIAM F. MORRIS III, DORIS MORRIS, RANDY CLAPSADL, ROBERT F. WARWICK, BRUCE BOWERS, JOHN KIMBER, NED LEARY, ED LEONARD, JOHN SHELL and MORRIS & ASSOCIATES, INC., a North Carolina Corporation, <br><br> Defendants. | **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Defendants, by and through their undersigned counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully submit this Memorandum in Support of their Motion for Summary Judgment.

## INTRODUCTION

In 2007, Plaintiff Bryan Johns became an employee of Morris & Associates, Inc. ("Morris & Associates" or the "Company"), a company with an Employee Stock Ownership Plan ("ESOP"). (Compl. ¶¶ 14-15.) The following year he became an ESOP Trustee (*id*. at ¶ 10), a position he held until shortly after he filed this action in 2023. (*See* Doc. 42.)

At the time Plaintiff became an ESOP Trustee in 2008, the ESOP share price of Morris & Associates was $55.71. (PX 48, at p. 3.)[1] As of December 31, 2022, the final year in which

---

[1] Cited record evidence is found in the Notice of Filing contemporaneously filed with this Motion.

Plaintiff served as Trustee, the per-share price had increased to $234.60 (PX 8, at p. 2), representing a 421% increase over the years during which Plaintiff was a Trustee. As Plaintiff himself testified, during those years, the number of employees of the Company increased from 50 to 130. (Johns Tr. 42:20-43:10.) Company revenues increased five-fold to over $50 million. (*Id.* at 43:16-44:3.)

Despite the Company's track record of growth during the 15-plus years that he served as an ESOP Trustee, Plaintiff contends that (i) the Company, (ii) the Company's CEO, William F. Morris, III, (iii) the Company's Board of Directors (Defendants Bowers, Kimber, Leary, Leonard, and Shell), and (iv) his three fellow ESOP Trustees (Doris Morris, Clapsadl, and Warwick, but not Plaintiff himself), engaged in significant breaches of fiduciary duty culminating in his termination from employment as an ERISA whistleblower.

Those claimed breaches of fiduciary duty, moreover, do not relate to an "overvaluation" of the ESOP shares – the classic fiduciary-duty breach in this context[2] – but instead to a claim that the Company was *undervalued*, *i.e.*, that the growth of the Company was even greater than a 421% percent increase reflected in its valuations. The balance of plaintiff's fiduciary-duty allegations, as described below, are a laundry list of pent-up grievances against Morris & Associates and the Morris family, most amounting to little more than a contention that "[i]f I was the chairman of the board, I probably wouldn't [do that]." (Johns Tr. 90:2-3.)

---

[2] *See*, *e.g.*, *Brundle on behalf of Constellis Employee Stock Ownership Plan v. Wilmington Trust, N.A.*, 919 F.3d 763, 769 (4th Cir. 2019) (alleging that an ESOP "overpaid for the stock – enriching the corporation's owners at the expense of its employees"); *Chao v. Hagemeyer North America, Inc.*, No.: 2:06-01173-PMD, 2006 WL 8443663, at *2 (D.S.C. Oct. 20, 2006) (describing how an overvaluation allowed fiduciaries to receive greater than fair market value for sale of their shares to ESOP participants who "receive[d] relatively worthless stock instead.").

2

## PROCEDURAL BACKGROUND

Plaintiff filed this action against Defendants on June 16, 2023. (Doc. 1 ("Compl."). Plaintiff's first three claims for relief (Compl. ¶¶ 117-146), each asserts various "Breaches of Fiduciary Duty" under ERISA, 29 U.S.C. § 1104(a)(1). Count I claims that the "Trustee Defendants" (defined as Mr. Morris, Ms. Morris, Mr. Clapsadl, and Mr. Warwick (*id.* at ¶ 1)) and the Company breached fiduciary duties by "causing and allowing inaccurate valuations" of the Company's ESOP. (*Id.* at ¶ 117.) Those annual appraisals were carried out by an independent appraiser, John Sudol of Crescent Valuation Services, LLC. (*See id.* at ¶ 63.) Count II contends that those same Defendants breached fiduciary duties by "allowing use of corporate assets for personal benefit and excessive compensation" for Mr. Morris. (*Id.* at ¶ 128.) Specifically, Plaintiff alleges that those Defendants "caused the ESOP financial harm by diminishing the value of Morris Inc. stock where they caused [Mr. Morris] to receive excessive compensation and allowed [Mr. Morris] to use corporate money for his own benefit, such as for his personal estate planning." (*Id.* at ¶ 133.) Count III, also against those same Defendants, claims that they breached their fiduciary duties by "managing the ESOP and the Company for the benefit of [Mr. Morris] and his family at the expense of the ESOP and its participants." (*Id.* at ¶ 136.) That claim reiterates the earlier contentions from Count I and II concerning the valuations and Mr. Morris's compensation and estate planning expenses, but also adds an allegation regarding "hir[ing] and pay[ing] multiple family members from Company assets." (*Id.* at ¶ 144.)

Plaintiff's fourth and final Count – against Mr. Morris, the Company and its Directors – is a claim under 29 U.S.C. § 1140 in which he contends that he was discharged as a Company

employee and removed from his ESOP roles for exercising rights as a participant or beneficiary in the ESOP. (Compl. ¶¶ 147-154.)[3]

## STATEMENT OF FACTS[4]

**A.    Plaintiff's Role as an ESOP Trustee.**

In his Complaint, Plaintiff seeks to paint a picture in which he was largely if not entirely left out of the loop as an ESOP Trustee. (*See* Compl. ¶ 88 ("[a]t no time did [the appraiser] meet with or discuss his valuation and assumptions with Johns or anyone responsible for the ESOP who was not a member of the Morris family").) The record evidence, however, does not bear out his contentions.

For example, in 2015, Sudol's first year as the ESOP's appraiser, Mr. Morris forwarded a draft of Sudol's appraisal and Mr Warwick's notes to his fellow Trustees, including Plaintiff. (DX 10.) After Ms. Clapsadl provided comments as well (which Plaintiff was copied on) (*id.*), Plaintiff himself responded to the group, including his fellow Trustees, indicating that the draft used the "same methodology used in prior appraisals and [was] not too far off what I'd expect the number to be." (*Id.*) Plaintiff then stated "I move we accept the current appraisal as final and let Sarah [Clapsadl] get on with the process." (*Id.*)

Later, in 2016, after Sudol's first year appraising the ESOP, Mr. Morris circulated to Ms. Clapsadl, Mr. Warwick, and his fellow Trustees including Plaintiff, an email attaching a phone

---

[3] In connection with the earlier-filed partial motion to dismiss, Plaintiff contended that he was proceeding solely under the first sentence of 29 U.S.C. § 1140 ("[i]t shall be unlawful for any person to discharge. . . a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan. . .or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan"), *i.e.*, "for his efforts to investigate and manage the valuation of the ESOP stock." (Doc. 42, at p. 8.)

[4] Morris is providing is Statement of Undisputed Material Facts with its Motion for Summary Judgment. The Statement of Facts herein contains certain additional facts which are useful for context.

4

message from Sudol and inquiring whether the Company "should try someone else because of the way [Sudol] does the valuation." (DX 7.) Mr. Warwick, again copying everyone, indicated that he was comfortable with Sudol and no other Trustee, including Plaintiff, registered any objection to Sudol's continued retention. (*Id.*; Johns Tr. 188:21-24.) Sudol continued as the ESOP's appraiser through 2023 and at no time did Plaintiff indicate any objection to Sudol acting in that role. (*Id.* 189:8-10.) Over the course of those years, Plaintiff admitted, he never proposed consideration of another ESOP appraiser, stating only "[t]oward the tail end," *i.e.*, 2023, "I would have wanted somebody different." (*Id.* at 189:11-15.)

During those years, the documentary record also indicates that Plaintiff was very much "in the loop" regarding Sudol's work as the appraiser. Among other things:

- Plaintiff was included in correspondence concerning the proposed Timeline for 2017 Plan Administration. (PX 20.)

- In 2018, Plaintiff stated in correspondence with respect to Sudol that was "doing a good job." (DX 11.)

- Plaintiff was provided by Ms. Clapsadl with a draft of Sudol's 2018 ESOP valuation and included, along with Mr. Warwick and Plaintiff's fellow Trustees, on lengthy back-and-forth correspondence concerning various appraisal issues including a 3-year trailing period for earnings, "current sale numbers," and Sudol's selected "equity risk premium." (PX 19.)

- In 2019, Plaintiff received Sudol's appraisal from Ms. Clapsadl (and then actually forwarded it to an outside consultant (*see* pp. 15-17, *infra*) (DX 14).

- On June 25, 2019, Ms. Clapsadl provided Plaintiff with a draft of Sudol's Report and asked Plaintiff if he had "any issues or questions I need to pose before I move to finalize." (PX 25.)

- In August of that same year, Plaintiff and Ms. Clapsadl engaged in a lengthy written discussion of ESOP valuation issues. (*Id.*)

- For the 2020 Plan Year appraisal, Plaintiff and his fellow Trustees were provided with the appraisal as well as Sudol's explanation for a slight drop in the valuation (including a discussion of 2020 declines in net sales, operating income, pre-tax earnings, and EBITDA,

as well as cash equivalents).  (PX 18.)  (Plaintiff conceded that he registered no written objection to Sudol's rationales.  (Johns Tr. 201:17-24.)

- He also conceded that he discussed ESOP issues with Sudol.  (*See id*. at 136:12-137:7.)

Indeed, as late as 2023, Plaintiff actually signed the Company check which paid Sudol. (DX 9; *see also* DX 8 (June 15, 2022 check signed by Plaintiff for Sudol's "Retainer Fee for 2021 Plan Year ESOP Valuation").)  In sum, Plaintiff cannot contend that he was out-of-the-loop during the Complaint's Relevant Period of 2017 to the present.

## B.    Valuation Issues

Because there "is no generally recognized market for the stock of the privately-held Morris Inc., 'the determination of fair market value of Company Stock for all purposes under the Plan shall be made by the Trustee based upon the value determined by an independent appraiser that meets the requirements similar to the requirements of the Treasury Regulations prescribed under Internal Revenue Code §170(a)(1) and who is recognized as having expertise in rendering such evaluations.' Plan Doc. § 5.03."  (Compl. ¶ 48.)  In his Complaint, Plaintiff contended that "the Trustee Defendants," but not him, failed in their "responsibility and duty [1] to value the Plan's stock, [2] investigate the valuator's qualifications, [3] hire a qualified valuator, [4] provide the valuator with complete and accurate information, and [5] make certain that reliance on the valuator's advice was reasonably justified under the circumstance."  (Compl. ¶ 124.)  Plaintiff's primary concerns about the valuation relate to the treatment of working capital (*i.e.*, whether the Company had "excess cash") (*see id*. at ¶ 58), and, to a lesser degree, the treatment of the Company's charitable contributions (*id*. at ¶ 59).

### 1.    The Valuator's Qualifications

In his testimony, Plaintiff backed off from any contention that Sudol was not qualified to perform the valuation.  When asked whether he ever had reason to question Sudol credentials,

Plaintiff first claimed that "I wasn't involved in the process of retaining him, so I wouldn't have known to have questioned it." (Johns Tr. 165:19-24.) As noted above, however, the evidence shows that Plaintiff was part of the process of retaining Sudol. (*See* DX 7.)

Later asked whether he ever became aware of Sudol's qualifications, Plaintiff claimed "I don't remember what school he went to, whether he's done a lot of ESOP appraisals." (Johns Tr. 167:4-8.) Questioned concerning whether Sudol's qualifications were "not stated in the valuations you received every year," Plaintiff tried to duck responsibility: "[t]here were 160 pages [and] I'm not sure what was all in them." (*Id*. at 167:15-19.)

In fact, Sudol's appraisals provided in an appendix a complete account of his qualifications including that he had "more than 40 years of experience in the valuation of closely held businesses," including ESOPs, across multiple industries (including "manufacturing"). (*See* PX 8, at p. Morris-Johns 010027.) That appendix also noted that Sudol was an "Accredited Senior Appraiser" of the American Society of Appraisers, and that he had a degree in accounting. (*Id*.)

Later, when asked why instead of signing the checks paying Sudol, he did not relate to his fellow Trustees any concerns about Sudol, Plaintiff appeared to entirely back off any contention regarding Sudol's qualifications. (*See* Johns Tr. 192:13-193:3 ("I think the fundamental problem we had was not the guy doing the appraisal.").)

### 2. Accuracy of the Information Provided to Sudol.

Ultimately, Plaintiff conceded that the issue, rather than being Sudol or his qualifications, "was more that the information we were giving him wasn't suitable." (Johns Tr. 193:18-21.) Thus, for example, the Complaint alleges that Mr. Morris "had a duty to provide the valuator complete and accurate information to conduct the valuations." (Compl. ¶ 123.) Yet, when asked to identify any information provided to that was incomplete or inaccurate, Plaintiff could identify nothing

apart from "a judgment call" about "whether cash was properly included in working capital." (*See* Johns Tr. 205:19-206:2.) As Plaintiff put it, "we all agreed on the amount of cash we had there," but "[h]ow much of that was required working capital and how much of that was excess is something that seemed wrong to me." (*Id*. at 205:23-206:1.)

### 3. Working Capital Needs.

With regard to the issue of excess cash, Plaintiff conceded that "reasonable people could disagree about how much working capital you needed to have." (Johns Tr. 56:19-20.) As he testified concerning Mr. Morris, "Bill's a guy who's been through a lot of downturns" (*id*. at 133:14-15), recognizing that "[d]ifferent people manage a company differently; reasonable people can disagree on some things." (*Id*. at 133:15-17.) As Mr. Morris stated, he believes in operating the Company conservatively in light of his experience. (Declaration of William F. Morris III, sworn to November 11, 2024 and filed herewith ("Morris Decl."), at ¶ 4.) Nevertheless, Plaintiff, in his testimony recognized the actual existence of most if not all of the issues facing the Company identified by Mr. Morris as his rationales for the conservative treatment of Company cash, including:

- The volatility of the Company's cash flow resulting from the volatile capital spending of its customers (Morris Decl. ¶¶ 8-9; Johns Tr. 34:13-35:20; 70:9-71:2 (revenues were not "steady" and "[t]here were definitely big lumps").)

- The highly engineered and custom nature of the Company's products which, among other things, requires substantial investment in research and development (Morris Decl. ¶¶ 4, 8; Johns Tr. 46:3-12; 57:19-21 ("almost every big piece of equipment would be bespoke or at least tailored to the customer's needs.").)

- The need of the Company to constantly reinvent itself and its products in order to keep pace with the market (Morris Decl. ¶ 6; Johns Tr. 59:10-15 ("[i]f we had to completely reinvent ourselves, it would require cash to do that,").)

- The expensive and potentially debilitating patent litigation with a competitor faced by the Company (Morris Decl. ¶ 13; *see* Johns Tr. 48:21-25; 50:8-51:25.)

8

- Significant personal injury lawsuits faced by the Company including a wrongful death action regarding installed equipment manufactured by the Company in which over $10 million in damages was sought (Morris Decl. ¶ 13; Johns Tr. 52:1-18.)[5]

- The fact that much of the Company's cash is reflected a corresponding liability in the form of customer deposits which varied widely throughout the year (Morris Decl. ¶ 12; Johns Tr. 60:16-21.)

- The Company's exposure to country-risk as its share of international sales increased resulting in issues such as cancelled orders based on sanctions (Russia) and financial shocks within individual countries (*e.g.*, Argentina and Venezuela) (Morris Decl. ¶ 10; Johns Tr. 67:1-18; 67:11-13 ("that [Russian] market was growing really nicely for us and it had stopped growing").)

- Mr. Morris's determination to operate the company without debt in order to guard against potential problems with lenders and/or the requirement for personal guarantees from minority shareholders (Morris Decl. ¶¶ 4-5; Johns Tr. 64:1-7; 64:24-65:5.)

- The stock put rights of the minority shareholders that could require the Company to make substantial cash outlays upon the death of minority shareholders (*see* Morris Decl. ¶ 14; Johns Tr. 340:6-24.)

In addition, Plaintiff confirmed the existence of each of the Company's current going-forward projects that will require significant cash commitments from the Company, including the expansion of the Company Lineguard® service initiative (Morris Decl. ¶ 16; Johns Tr. 253:7-17; 254:3-14), construction of a new building required to support that initiative (Morris Decl. ¶ 17; Johns Tr. 261:19-263:1), and the Company's foray into a new technology using freeze distillation to improve environmental performance in oil drilling for which the Company has contracted to construct a pilot plant in Texas (Morris Decl. ¶ 18; Johns Tr. 255:5-257:23). While, as Johns conceded, "reasonable people can disagree" (*id*. at 133:15-17), as to the necessary cash requirements to support the Company's working capital needs for these projects, the fact of their existence is undisputed.

---

[5] With regard to that issue, Plaintiff conceded that he and Mr. Morris discussed the Company's need for a "rainy day fund" for such litigation. (Johns Tr. 53:12-54:1.)

4.      **Charitable Contributions.**

Plaintiff alleged that the "Company's charitable contributions, which reduced the value of the ESOP, were directed by Bill III and his wife." (Compl. ¶ 59.)[6] (Details concerning the charitable-contribution policy can be found at Morris Decl. ¶¶ 27-30.)

Plaintiff's testimony on the charities issue was, at best, ambivalent. As with many of allegations asserted by Plaintiff as putative breaches of fiduciary duty, in the end, he wound up endorsing the basic concept – and "I think that money came back to us" (Johns Tr. 269:12-18) – followed by a minor caveat that "there were some things I would have done differently." (*Id*. at 269:11-12.) While Plaintiff testified that "[t]here are probably a few charities in there that I didn't think were as aligned with Morris & Associates' customer base and growth as others were" (*id*. at 270:12-14), he also testified that the Company's "longstanding" charitable-contribution policy (*id*. at 268:22-24), in fact, advanced the Company's business with respect to its employees, its customers, and in its community. In any event, Plaintiff admitted that at no time did he seek to change the Company's policy in his role as an ESOP Trustee (*id*. at 270:2-271:4), or seek to change the treatment of charitable contributions in the annual ESOP appraisal. (*Id*. at 271:11-21.)

In seeking out new employees for the Company, Plaintiff stated that an important attribute was that they be "altruistic and empathetic" (Johns Tr. 275:1-5), averring that "I think if you are a selfish person who doesn't care much about others you probably wouldn't fit in" at the Company. (*Id*. at 275:14-16.) Thus, the Company publicized its charitable efforts to its employees in "a gathering of all the employees once a year and handed out checks at the gathering." (*Id*. at 276:2-

---

[6] That allegation forms the basis of the contention of Plaintiff's appraisal expert that Sudol should have "normalized" those charitable contributions by removing them from the Company's operating expenses which is one subject of Defendants' *Daubert* motion concerning that expert. (*See* Doc. 58, at pp. 15-18.)

8.)  Individual employees were given an opportunity to nominate potential charities for contributions.  (*Id*. at 276:15-18.)  Plaintiff even stated that he himself called the annual charity ceremony the "most important day of the year for Morris & Associates" (*Id*. at 278:19-22), and that he would tell employees "when you're working here, just know that in October when you're working really hard, some of the money you're generating is going to go to charities."  (*Id*. at 279:4-7.)  In Plaintiff's own words, "charity was something that was important at our company" and its charitable contributions provided motivation for employees.  (*See id*. at 279:11-14.)

Plaintiff also testified that the Company publicized its charitable efforts to its customers and that most customers "who knew us well knew that we did that," *i.e.*, contributed to charities.  (Johns Tr. 279:15-24.)   He recounted circumstances in which several important Company customers – *e.g.*, Butterball, Wayne Farms, House of Raeford – came to the Company's annual charitable event because their own charities were receiving contributions.  (*See id*. at 280:1-281:7; 282:9-19.)  Plaintiff ultimately conceded with regard to the Company's customers, "I think there were a lot of charities that were perfectly aligned – 'perfectly' is probably too strong a word.  There were charities that were aligned with Morris & Associates and what we were trying to get done, and there were probably some charities less aligned."  (*Id*. at 281:16-21.)

Plaintiff also conceded that Morris & Associates improved its community relations as a result of its charitable contributions.  (Johns Tr. 283:20-25.)  He specifically recalled that when there was a local infrastructure proposal that would have cut the Company's property in two with a four-lane thoroughfare, the Town of Garner remained supportive of the Company staying at its current location.  (*Id*. at 283:1-21.)

## C.     Mr. Morris's Compensation.

Plaintiff alleged in his Complaint that "[e]xcessive compensation was paid to Bill III throughout the Relevant Period" (Compl. ¶ 93), (defined as "June 2017 to the present," (*id*. at ¶ 1.).  He also alleged that Mr. Morris "routinely used corporate money to pay for his estate planning" (*id*. at ¶ 109), and even that his "salary is guaranteed, even after death."  (*Id*. at ¶ 59.)

In fact, the basic structure of Mr. Morris's compensation was set by the Board in a resolution over 20 years ago.  (*See* Doc. 15-3, at p. 8.)  On October 20, 2003, the Company's Board determined that Mr. Morris's annual salary would be $240,000 and that he would receive a bonus of "25% of the income of the Corporation before income tax." (*Id*.)  The Board resolution provided as "additional benefits" that the Company would "pay for income tax and financial planning services" for Mr. Morris.  (*Id*.)  As noted in a previously filed declaration (Doc. 15-3), Mr. Morris's salary was increased in 2010 to $290,000.  (*Id*.)  Since then, there has been no change in Mr. Morris's compensation or his structure, other than, in 2024, a portion of the bonus to which he would otherwise be entitled is now shared with other company executives.  (*See* Declaration of Edgar W. Leonard, sworn to November 11, 2024 and filed herewith ("Leonard Decl."), at ¶ 27.) Plaintiff, moreover, could not support the allegation that Mr. Morris's salary was guaranteed after death.[7]

---

[7] Plaintiff's testimony on the guaranteed-after-death salary is another example of his willingness to insert innuendo into the Complaint with little, if anything, to offer as evidentiary support. Questioned on the subject, Plaintiff stated that at a Board meeting at which he was present "they talked about a motion that I wasn't familiar with about him continuing on, about the compensation continuing on.  I don't think it was something I initially saw, but it was something I believe may have been the case."  (Johns Tr. 108:6-10.)  As with many of the allegations which he could not support, Plaintiff tried to pass it off on his lawyers:  "this document [the Complaint] was built through my attorneys.  But my – I think one of the phrases in here, if I remember right, is as we learned more we'll be able to populate this.  So did I believe that there was a compensation package for Bill after he died?  I think I may have believed that.  I don't know."  (*Id*. at 107:16-22.)

Plaintiff, in support of his allegations regarding Mr. Morris's compensation, testified only that "it seemed like a lot." (Johns Tr. 95:4-96:2.) That testimony, in turn, relied on "various spot checks on what a normal compensation package would look like" which appeared to be just a single instance: "I knew a guy that was running a 70 – actually, $750 million a year conglomerate of ESOPs. His total compensation was less than [$]1.5 [million]." (*Id*. at 97:4-6.) Plaintiff could not even remember the name of that individual. (*Id*. at 97:25-98:1.) Tellingly, Plaintiff conceded with respect to Mr. Morris's performance that "there were things I might have done differently, but I think he did adequately well" and that "there was a time," in the "earlier going," when Plaintiff "thought he did excellent." (*Id*. at 100:6-20.) While Plaintiff's Complaint faulted the Company for not "commission[ing] executive compensation studies to evaluate the compensation paid" to Mr. Morris (Compl. ¶ 95), Plaintiff never sought to have the Company "undertake a compensation study." (Johns Tr. 102:7-10.)

Although Plaintiff complained that Mr. Morris's compensation was "set very early on and wasn't revisited for a very long time" (Johns Tr. 101:10-14), long-time independent Board member, Professor Leonard, explained that the Board was aware that Mr. Morris's compensation had been set in the early years of the Company and, given the continuing growth and success of the Company and Mr. Morris's integral role in that growth and success, the Board did not consider that any reduction to his compensation would be appropriate. (*See* Leonard Decl., at ¶¶ 24-27.))

## D.  Morris Family Employment and Compensation.

In the Complaint, Plaintiff alleged that other "Morris family members were frequently paid above-market salaries." (Compl. ¶ 59.) That allegation is repeated in substance in Count III in which he alleged that Mr. Morris "used his control over Morris Inc. and the ESOP" to "hire and

13

pay multiple family members from Company assets." (The qualifications of the Morris family members were described in an earlier-filed declaration. (Doc. 15-3, at ¶¶ 5-9.))

In his testimony, Plaintiff conceded both the qualifications and the appropriate salaries of those family members while registering only minor quibbles. Plaintiff initially stated that "some of the family members moved up through the ranks more quickly and their compensation was, I think, slightly above market." (Johns Tr. 113:14-15.) Asked specifically whether he contended that Ms. Morris "was paid an above-market salary in her role as company bookkeeper," Plaintiff stated "[n]o I think her not so much." (*Id*. at 114:20-23.) He also conceded that "she was qualified" for the bookkeeper role. (*Id*. at 115:19-25.) Similarly, with regard to Ms. Clapsadl, the company accountant, he testified not only that she was qualified for the position (*id*. at 121:12-16), but that she was "was appropriately compensated" and "I set that salary." (*Id*. at 120:25-121:7.)[8] As for Mr. Morris's son, Bill IV, a company engineer with a construction management background (*see id*. at 125:16-22), Plaintiff could only claim a "slightly" above-market salary. (*Id*. at 121:17-23.)[9]

Even with respect to Defendant Randy Clapsadl who ultimately took his place as Company President, Plaintiff could only state that Mr. Clapsadl's compensation was "slightly" above market, "but not a huge amount." (Johns Tr. 116:6-12.) Asked about Mr. Clapsadl's qualifications, Plaintiff could only quibble that "he was groomed on a daily basis to bend towards those roles, that he was given access to positions that he likely wouldn't have had access to quickly had he not been a family member." (*Id*. at 120:14-18.)

---

[8] Plaintiff did, however, describe a $10,000 raise Ms. Clapsadl received upon taking over the role of Corporate Secretary as "seem[ing] a bit excessive." (Johns Tr. 121:3-5.)
[9] Plaintiff stated that "[i]f we had five people that worked there that had similar background and experience, his compensation, as memory serves, would probably be a little higher than the other guys with similar experience." (Johns Tr. 122:5-9.)

14

**E.    Plaintiff's Years-Long Inaction on the Issues About which He Now Complains.**

In an effort to explain away how he served as an ESOP Trustee from 2008 but never took any action until his termination from employment, Plaintiff concocts a claim the "lightbulbs really came on" (Johns Tr. 22:19-21), when he attended an ESOP conference in 2023.  (*Id*. at 22:22-23:2.)  Thus, he contends, "when did I feel very strongly that we were not operating the plan to normal industry norms, yeah, that was 2023." (*Id*.)  Before then, he now contends, he did not have "as clear an understanding" of his fiduciary duties (*id*. at 23:17-24), until that "was clarified in '23." (*Id*. at 24:1.)  The record evidence shows that, in fact, he was aware of the same issues he raises now no later than September 2019 when he consulted an ESOP consultant who expressed the view that excess cash should be included in the valuation of the Company.  (*See* pp. 15-17, *infra*.)  Importantly, Plaintiff failed to convey that information to his fellow Trustees, the ESOP's lawyer, or anyone in management at the Company.

**1.    Plaintiff's Secret Consultation with Another ESOP Consultant.**

In June 2018, Plaintiff reached out to the Carolinas Chapter Administrator of the ESOP Association stating that "[w]e have a valuation company that I think is doing a good job, but I wanted to get an outside opinion on the number they generate to see if it is in the right ball park." (DX 12).  Plaintiff added "I'm one of four trustees and just wanted to do some due diligence to make sure the number accurately reflects the company value."  (*Id*.)  In response, Plaintiff was provided with the name of Brant Armentrout, CFA of Comstock Advisors.  (*Id*.)

The following year, on September 4, 2019, Plaintiff forwarded to Armentrout the Sudol Appraisal Report for Plan Year 2018 which Ms. Clapsadl had provided to Plaintiff and the other Trustees on August 6, 2019, requesting that Armentrout "have a look at the attached appraisal and let me know if everything looks right to you."  (DX 14.)  As Plaintiff later testified, "I just wanted

to get an outside opinion" of "when does working capital become excess cash." (Johns Tr. 221:16-22.)  Plaintiff stated that he spoke to Mr. Armentrout on September 6, 2019 because he "was concerned that the valuation was under value in cash." (*Id*. at 239:17-21.)  Plaintiff spoke to no one at the Company about the fact that he sent the appraisal to Armentrout to get a second opinion regarding Sudol's appraisal.  (*Id*. at 225:25-226:6.)

That conversation was then memorialized in an email exchange between Plaintiff and Armentrout.  (DX 15.)  First, in a communication on September 6, 2019, Plaintiff asked Armentrout to "jot down something so I can have that for reference when I reach out to the ESOP attorney." (*Id*.)  One of the listed items for which Plaintiff sought additional confirmation was his third bullet point in which Plaintiff stated "[c]ash on hand that is not deposits on contract but it beyond working capital should be factored into the share price," further noting that "[i]mpact would inflate value." (*Id*.)  Armentrout responded on September 11, 2019:  "Correct, there is a substantial amount of excess cash that needs to be added to value." (*Id*.)

Having received that information, Plaintiff did nothing.  He did not, as he told Armentrout he would do, reach out to the ESOP attorney.  (Johns Tr. 234:22-235:2.)  Plaintiff never told his fellow Trustees that he had consulted with another ESOP consultant nor did he provide them with his communications with Armentrout.  (*Id*. 239:8-241:15.)  In Plaintiff's own words:

> Q But you never said, Hey, I went out and spoke to a consultant. I showed them our valuation.  He says we have excess cash that needs to be added to value?
>
> A I would not have said that to Sarah or Randy because if Bill found out that I shared a piece that have kind of information – I don't think Bill would want me reaching outside for advice, so, no, I wouldn't have said that.

(*Id*. at 242:3-11.)

Plaintiff's failure to share Armentrout's assessment is made even more egregious by the fact that just one month before his correspondence with Armentrout, Plaintiff had exchanged

16

communications with Ms. Clapsadl in which he stated that "I'm not sure I'm ever going to understand how they take excess land into the calculation but not excess capital," and she stated that she was "also confused why/how they [the appraisers] treat cash." (PX 25.) (In that same correspondence, Plaintiff himself informed Ms. Clapsadl that the appraisal appeared to be in the "right range." (*Id.*; Johns Tr. 245:10-24.)) Plaintiff conceded that he said nothing about his consultation in 2019 and only raised the issue four years later in 2023:

> Q Well, and you could have said, "Hey, look, I talked to this guy. He says we have excess cash," but you did nothing, right?
>
> A No, I've done that. I can tell you I've had several conversations with her, and I had – like I said – I mean, this is – they ramped up in the vigorousness and the duration, the conversations we had about the excess cash up until 2023. But I sat in a conference room with Sarah and with Randy in 2023 talking about excess cash and talking about, like, We have a real problem here; that we are going to end up with a lot of legal expenses trying to sort this stuff out if we don't get out in front of it. So –
>
> Q That was four years after Mr. Armentrout sent you this thing in 2019, right?
>
> A It was four years after this, and I started working on it right then.

(*Id.* at 247:14-248:6.)

### 2. Plaintiffs' Failure to Raise Issues and Other Inactions on His Part.

Beyond failing to bring Mr. Armentrout's issue to his fellow Trustees or anyone in management, the litany of Plaintiff's other failures to address things he now complains about is a long one. Plaintiff concedes that:

- In his role as an ESOP Trustee, he never voted against or recommended that his fellow Trustees vote against person nominated to serve on the Company's Board. (Johns Tr. 87:6-19.)

- Over the last ten years in which he served as a Trustee, he never recommended an alternative candidate for the Board. (*Id.* at 85:21-86:9.)

- He never recommended the appointment of any other potential ESOP Trustee. (*Id.* at 151:1-6.)

17

- He never recommended using an appraiser other than Sudol. (*Id*. at 189:11-20.)

- He never objected to the year-to-year retention of Sudol as the ESOP appraiser (*id*. at 189:8-10), or registered any objections or qualms to Sudol's continuing retention. (*Id*. at 169:3-15.)

- He never raised any issues regarding the ESOP valuation with any outside director until 2023 (*Id*. at 156:25-157:11.)

- He never raised any concerns about Sudol's annual valuation with his fellow Trustee, Mr. Warwick. (*Id*. at 147:7-13.)

- He never raised in writing any concern about the ESOP valuation. (*Id*. 135:9-15.)

- He never reached out to the ESOP attorney when cash issues were flagged in 2019. (*Id*. at 234:22-235:2.)

- He never raised any issue with any ESOP regulator. (*Id*. at 157:12-25.)

- He never sought to have the Company undertake a study concerning Mr. Morris's compensation or recommended that course to his fellow ESOP Trustees. (*Id*. at 102:7-103:4.)

- He never sought in his role as an ESOP Trustee to change the Company's charitable contribution policy. (*Id*. 269:3-18.)

- He never sought in his role as an ESOP Trustee to change the treatment of charitable contributions in the annual ESOP appraisal. (*Id*. at 271:11-22.)

Plaintiff offers multiple excuses for his failures, but the fact of those failures remains.

## F.     Plaintiff's Termination from Morris & Associates.

Although earlier in his career at the Company Plaintiff had been considered a possible future CEO (Leonard Decl. ¶ 20), by no later than 2021, that prospect was ended. (*See id*. at ¶ 22.) In December 2021, he was demoted from the role of President to that of Chief Operating Officer. (*Id*.) By that point, Plaintiff understood that "there was no path for [him] ever to be CEO of the company." (Johns Tr. 284:11-12.) As Professor Leonard, an independent Board member states: Plaintiff "could sometimes be off-putting to both fellow employees and customers" and his "issues were regularly discussed by the Board in its closed sessions." (Leonard Decl. ¶ 20.)

18

Even before his demotion, starting in September 2021, Plaintiff began surreptitiously recording conversations with his work colleagues. (Johns Tr. 286:11-18; 287:20-288:6.) He conceded that as early as 2021 he was preparing for a lawsuit and "collecting evidence." (*Id*. at 292:23-293:12.) He also began "sending home," *i.e.* to a personal email account, various work emails "at the same time as well." (*Id*. at 293:6-8.)

By the Spring of 2023, he was "thinking through how much cash we had" and "[h]ow we might be able to put an offer together." (Johns Tr. 323:9-14.) That issue was reflected in a document he created (PX 48, at p. 24), in which he put together a pro forma proposal to use the ESOP's cash to buy out the Morris family. (Johns Tr. 324:18-23 ("to me one of the clear paths to resolution, especially at the time, was that the ESOP would offer to buy out Bill's shares. So what I was thinking is, we could try and put together an offer to do that, where the ESOP – we could become 100 percent owned.").) He admitted that he first "started crafting on this" in 2021 or 2022. (*Id*. at 328:17-22.) It is also clear that in his contemplation, he would be the executive managing the Company once he accomplished the buyout. (*See id*. at 328:6-16.) In other words, he could accomplish his long-time desire to become CEO by using the ESOP's cash to displace the management that had overseen the 421% growth of the Company during his tenure as an employee.

In fact, as Mr. Morris explained, Plaintiff lacked "leadership and 'people skills'" and had an uncontrollable tendency "to talk too much (and too loudly), and to fail to listen to others," which happened "not only within the Company, but also with Company customers." (Morris Decl. ¶ 21.) After a negative performance review in 2020 (*id*.), at the end of 2021, Plaintiff was, as noted above, "demoted from the position of President to Chief Operating Officer and largely removed from customer-facing responsibilities." (*Id*. at ¶ 22.) When Plaintiff went behind Mr. Morris's back to

complain to other executives, Mr. Morris counseled him on that issue and sought to help him overcome his tendency "to talk at employees rather than listen." (*Id*. at ¶ 23.)

Plaintiff nevertheless continued to create problems within the Company "by hiring and advancing unsuitable employees and failing to timely address performance problems with those employees." (Morris Decl. ¶ 24.) Plaintiff "also failed to address quality control and accountability issues in the Company's manufacturing shop." (*Id*.) Mr. Morris continued to be concerned that Plaintiff was creating a negative culture within the Company. (*Id*.) In addition to continuing "to try to create dissension within the Company's management team," Plaintiff, at the Company largest trade show in January 2023, had to be specifically counseled regarding a customer problem which he created by one of his customer interactions. (*Id*. at ¶ 25.) Ultimately, by April 2023, Mr. Morris "had lost confidence in [Plaintiff's] ability to be a positive force in the Company (and even questioned whether he had any real desire to be such a force)." (*Id*. at ¶ 26.) For those reasons, Mr. Morris decided to terminate Plaintiff. (*Id*.)

After Plaintiff was terminated, "the Board determined to remove him as a member of the ESOP Committee and as an ESOP Trustee" because "it was not appropriate for an ex-employee to serve in those roles." (Leonard Decl. ¶ 23.)

## **ARGUMENT**

### I. **Summary Judgment Standards Under Rule 56.**

As this Court is well-aware, summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movants "bear[] the initial responsibility of informing the district court of the basis for [their] motion, and identifying those portions of [the record] which [they] believe[] demonstrate the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In the words of this Court, "[o]nce the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." *Dew v. E.I. Du Pont de Nemours and Co.*, No. 5:18-CV-73-D, 2024 WL 4349883, at *13 (E.D.N.C. Sep. 30, 2024) (quoting *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). Thus, "[o]nly disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment." *Colorado Bankers Life Ins. Co. v. Academy Fin. Assets, LLC*, No. 5:20-CV-185-D, 2021 WL 6064843, at *3 (E.D.N.C. Dec. 22, 2021) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).)

As stated in *Liberty Lobby*, "at the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249. While, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." *Id*. at 255, such "permissible inferences must still be within the range of reasonable probability, ... and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 1982).

## II.    Plaintiff has Suffered No Injury and Therefore Lacks Standing to Assert Counts I-III.

As alleged in the Complaint, "Plaintiff is an ESOP participant who was recently discharged from employment, and as such will receive a distribution from the Plan pursuant to its terms." (Compl. ¶ 153.) As further alleged in the Complaint, Plaintiff's discharge occurred on April 24, 2023. (*Id*. at ¶ 14.) Under the terms of the Plan, Plaintiff is not entitled to a distribution until the

end of 2028.  (*See* PX 40 ("Plan Doc."), at § 10.04(b)(ii).)[10]  That distribution will be made based

on an annual valuation of fair market value that will not be conducted until that year.  (*See id*. at

§§ 2.48 & 10.05(c).)

Plaintiff himself recognized that any distribution to him was years away:

Q Under the terms of the plan, when can you first receive a distribution?

A I'd have to have the plan documents in front of me.  It's probably around 5 to 6 – somewhere between year 5 and year 6, and probably depends on what time I was terminated.  I'd have to refresh my knowledge, but around five years afterwards, give or take.

Q Sometime in 2028?

A Probably around – plus or minus a year from '28.

(Johns Tr. 348:9-19.)  That colloquy continued with a discussion of whether Plaintiff had suffered

any injury:

Q So to date, would you say you haven't been personally injured due to the alleged undervaluation?

A No. I think – I think if I – I would make different decisions in my life if I knew that my shares were going to be appropriately valued.  So I'm having to make decisions. I'm having to make work decisions, I'm having to make a lot of different decisions in my life about my retirement packages and things because my shares aren't appropriately valued.

(*Id*. at 348:20-349:5.)

To bring suit in federal court, a plaintiff must have standing.  *TransUnion LLC v. Ramirez*,

594 U.S. 413, 417 (2021).  That standing, moreover, "is not dispensed in gross; rather, plaintiffs

must demonstrate standing for each claim that they press and for each form of relief that they seek

---

[10] Under that provision of the Plan Document, a participant who separates from service from the Company for any reason other than death, disability, or retirement at his "Normal Retirement Date" (defined as a participant's sixty-fifth birthday, Plan Doc. § 2.33), is entitled to distribution at the close of the fifth "Plan Year" (defined as "the twelve (12) month accounting period which begins on January 1 and ends on December 31," *id*. at § 2.18), following the Plan Year in which the participant was separated from service.  (*Id*. at § 10.04(b)(ii).)

(for example, injunctive relief and damages)." *Id.* at 431. A plaintiff "must demonstrate, among other things, that [he] suffered a concrete harm." *Id.* at 417. In the words of the Court in *TransUnion*: "No concrete harm, no standing." *Id.* Importantly, it is the party invoking federal jurisdiction "who bears the burden of establishing standing" under Article III. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411-12 (2013).

In *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020), the Supreme Court established a principle important to this case, namely, "[t]here is no ERISA exception to Article III." Thus, a prospective plaintiff in an ERISA action, like the Plaintiff here, in order "[t]o establish standing under Article III of the Constitution," must "demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief. *Id.* at 540 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).

The Court's holding in *Thole* rejected a contention by the plaintiff that because ERISA affords beneficiaries and participants with "a general cause of action to sue for restoration of plan losses and other equitable relief" under 29 U.S.C. §§ 1132(a)(2), (3) – the same causes of action asserted by Plaintiff here – that a "plaintiff automatically satisfies the injury-in-fact requirement." 590 U.S. at 1620. Instead, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* (quoting *Spokeo Inc.* v. *Robins*, 578 U. S. 330, 341 (2016)).

In a recent case concerning the "imminence requirement," the Fourth Circuit held that at the summary judgment stage, a plaintiff "'can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts' to establish standing." *Bhambhani v. Neuraxis, Inc.*, No. 22-1764, 2024 WL 2815063, at *1 (4th Cir. Jun. 3, 2024) (per curiam) (quoting *Clapper*, 568 U.S. at 412 (cleaned up)). The "threatened injury must be certainly impending to constitute injury

23

in fact, and ... allegations of possible future injury are not sufficient." *Clapper*, 568 U.S. at 412 (cleaned up). Therefore, "[w]hen an allegation of future injury rests on a 'highly attenuated chain of possibilities,' that threatened injury is not imminent or 'certainly impending.'" *Bhambhani*, 2024 WL 2815063, at *2 (quoting *Clapper*, 568 U.S. at 410).

Here, as described above, Plaintiff has no entitlement to receive any payment until the end of 2028. The amount of that payment will be determined by a valuation made that year. Thus, no previous valuation and nothing about which Plaintiff has complained in this case will affect the amount he may receive in 2028. Such potential harm, years away, is necessarily speculative since it is not harm which is "*certainly* impending." *Abdullah v. Paxton*, 65 F.4th 204, 209 (5th Cir. 2023). In that case, the court upheld dismissal for lack of standing in an ERISA case in which the plaintiff claimed that a retirement plan rule that required divestment of certain investments that would "cause him to suffer future economic harm," *id.* at 208-09, could not support standing for an individual who did not "currently qualif[y] for any payments." *Id.* at 209.

Here, the only "harm" that Plaintiff has actually articulated, *i.e.*, having to make different decisions about retirement packages, is not only "highly attenuated" to use *Clapper*'s formulation, 568 U.S. at 410, but also fails to meet *TransUnion*'s concreteness requirement by having a "close relationship" to a "harm traditionally recognized as providing a basis for a lawsuit in American courts – such as physical harm, monetary harm, or various intangible harms including. . . reputational harm." *TransUnion*, 594 U.S. at 417 (citing *Spokeo, Inc.* v. *Robins*, 578 U. S. 330, 340–341 (2016)).

## III.     Plaintiff Failed to File His Fiduciary-Duty Claims Within the Statute of Limitations.

ERISA's "limitation of actions" provision, 29 U.S.C. § 1113, establishes a two-pronged approach to the limitations period, § 1113(1), which is six years after the date of the last action

24

which constituted the breach, or §1113((2), which curtails the earlier provision to "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." *See Allen v. MetLife*, No. 5:21-CV-174-D, 2022 WL 97178, at *6 (E.D.N.C. Jan. 10, 2022) (dismissing ERISA breach of fiduciary duty claims based on plaintiffs' June 2017 knowledge of alleged breach and failure to file claim by June 2020); *see also Browning v. Tiger's Eye Benefits Consulting*, 313 Fed. App'x 656, 662 (4th Cir. 2009) (finding time bar where Trustees had actual knowledge of facts demonstrating the violation).

Here, Plaintiff was on notice concerning the excess cash issue no later than September 11, 2019 when Armentrout corresponded with him. (DX 15 ("there is a substantial amount of excess cash that needs to be added to value.").) As for the other issues – charitable contributions, Mr. Morris's pay, the family members employed in the business – Plaintiff, as both an ESOP Trustee and executive in the Company – was necessarily on notice of their existence. Yet Plaintiff did not file this action until June 16, 2023, well beyond the three-year statute that ran no later than September 10, 2022.

## IV. Plaintiff has Unclean Hands and/or Acted *In Pari Delicto* by Participating In or Failing to Address the Issues Now Raised in the Complaint.

As described above in detail, Plaintiff participated in virtually every ESOP-related decision that he now complains about. Worse, although he was advised in 2019 to address the issues that he only raised in 2023, he did nothing at the time. Under the doctrines of *in pari delicto* and unclean hands, Plaintiff should be prohibited from seeking the equitable relief sought in his Complaint.

The doctrine of *in pari delicto* prohibits a plaintiff from recovering when he is equally at fault with defendants. *See Latta v. Rainey*, 689 S.E.2d 898, 910 (N.C. App. 2010). It is also applicable to federal claims in which a plaintiff is an "active, voluntary participant in the unlawful

activity that is the subject of the suit." *Pinter v. Dahl*, 486 U.S. 622, 636 (1988). The related doctrine of unclean hands "proscribes equitable relief when. . . an individual's misconduct has 'immediate and necessary relation to the equity that he seeks.'" *Henderson v. U.S.*, 575 U.S. 622, 626 n.1 (quoting *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245 (1933)).

Here, Plaintiff served as an ESOP Trustee for 15 years and did nothing to address the issues until after he was terminated. To the extent that other ESOP Trustees were engaging in a breach of fiduciary duty, Plaintiff is not excused. He never (i) objected to the retention of the appraiser, (ii) sought the retention of another appraiser, (iii) raised any issue about the appraisal in writing, or with the ESOP attorney, his fellow Trustee, Mr. Warwick, or any outside Board member, (iv) voted against any Board member or recommended appointment of an alternative Board member or ESOP trustee, (v) sought a study of Mr. Morris's compensation, or (vi) sought to change the Company policy regarding charitable contributions or their treatment in the valuation. (*See* pp. 17-18, *supra*.) Most problematic of all, when informed by an outside consultant in 2019 about the need to include excess cash in the valuation, he did nothing and told no one. (*See id.* at pp. 15-17, *supra*.) Having sat on his hands for years, Plaintiff cannot seek relief now.[11]

## V. Plaintiff Cannot Establish Any Breach of Fiduciary Duty.

Each of Plaintiff's first three claims are brought against the ESOP Trustees and the Company under 29 U.S.C. § 1104(a)(1) – titled "Prudent Man Standard of Care" – which, in pertinent part, requires that ESOP Trustees "discharge [their] duties with respect to a plan solely in the interests of the participants and beneficiaries" with "the care, skill, prudence, and diligence

---

[11] Although courts have held that those doctrines would not apply in an ERISA context to a receiver standing in the shoes of another, see, *e.g.*, *Ashmore v. Dodds*, 262 F. Supp. 3d 341, 353 (D.S.C. 2017), Plaintiff here himself participated in the very issues he complains about.

under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

In order to establish a violation of the statute, Plaintiff must show that Defendants failed to act solely in the interests of the plan participants or failed to "engage[] in a reasoned decisionmaking process consistent with that of a prudent man in like capacity." *See Brundle*, *supra*, 919 F.3d at 773 (quoting *DeFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 420 (4th Cir. 2007)).

### A. Plaintiff Cannot Establish Count I's Claims Concerning the Valuation.

As alleged in the Complaint, under the Plan Document (PX 40), the Trustees are required to determine the fair market value of the Company stock through an independent appraiser recognized as having expertise in rendering such evaluations." (Compl. ¶ 48.) Given Plaintiff's concession (at p. 7, *supra*), there does not appear to be any remaining contention that Sudol fails to meet those requirements or lacks expertise in rendering ESOP evaluations. Nor does there appear to be any remaining claim that Sudol was provided with inaccurate or incomplete information. (*See* pp. 7-8, *supra*.)

Instead, Plaintiff's contentions appear to be that the statement to Sudol that the Company's opinion that it had no excess cash constituted a breach of fiduciary duty, or, alternatively, that accepting Sudol's valuation based on that statement is a breach of fiduciary duty. Yet, as noted above, Plaintiff recognized that "reasonable people could disagree about how much working capital you needed to have" (Johns Tr. 56:19-20), and that "[d]ifferent people manage a company differently." (*Id*. at 133:15-17.) In the end, Plaintiff's breach of fiduciary duty claim comes down to nothing more than a difference of opinion about the appropriate level of cash. In other words, Plaintiff wants to substitute his business judgment for that of Company management which has successfully steered Morris & Associates for the past 21 years.

Not only does the claim come down to a difference of opinion, but Plaintiff, as discussed above in detail (at pp. 8-9, *supra*), recognized the factual underpinnings of all of the issues facing the Company which current management believes require higher cash holdings, including (1) the volatility of its revenue stream, (2) the fact that its products are required to be custom engineered and manufactured and require substantial investment in R&D, (3) the Company's need to reinvent itself in order to remain viable, (4) the potential threats posed by IP and product-liability litigation, (5) the fact that the Company's customers deposits held in cash are represented by a corresponding balance-sheet liability, (6) the additional risks posed by increasing international sales, and (7) the potential need for capital to satisfy shareholder put rights.  (*See id*.)  That management might be conservative, for example, concerning its appetite for debt financing is not a basis for a claim of breach of fiduciary duty.

Plaintiff, moreover, also recognized the Company initiatives for which cash has been earmarked, namely, the Lineguard® service initiative, the need for a new building, and the foray into freeze distillation technology in oil drilling.  (*See* p. 9, *supra*.)  Again, "reasonable people" might disagree about those initiatives and the amount of working capital needed to support them, but to call them a breach of fiduciary duty – particularly given management's successful and long-term track record of success – is unwarranted.[12]

The same is true of the issue of charitable contributions.  In the end, Plaintiff agreed that the contributions supported the Company's business with regard to its workforce, its customers, and goodwill in its community.  (*See* pp. 10-11, *supra*.)  Plaintiff's caveat that there "were some

---

[12] Valuations in general are subject to differences in opinion given that "valuation is not an exact science."  IRS Rev. Rul 59-60, § 3.01.  (*See* Doc. 58, at pp. 4-5.)

things I would have done differently" with the charitable contributions (Johns Tr. 269:11-12), is hardly the stuff of a breach of fiduciary duty.

**B. Plaintiff Cannot Establish Count II's Claims Concerning Mr. Morris's Compensation.**

The basic framework for Mr. Morris's compensation was set by the Board in 2003 and his base compensation has not changed in 14 years, since 2010. (Doc. 15-3, ¶¶ 10-13, Ex. A.) Plaintiff's contention that the compensation "seemed like a lot to me" (Johns Tr. 96:11-13), based on a single data point "spot check" of a "guy [Plaintiff] knew," (*id*. at 97:4-6), is insufficient to establish a breach of fiduciary duty on the part of the ESOP Trustees or the Company. Plaintiff, moreover, has not come forward with any sort of compensation study indicating that Mr. Morris's compensation was outsized, let alone a breach of fiduciary duty. Finally, Plaintiff's own appraisal expert, Brown, does not seek to characterize the compensation as abnormal, or, in his revaluation of the Company, seek to "normalize" that compensation to some lower amount. (*See* Doc. 57-1.)

**C. Plaintiff Cannot Establish Count III's Claims Concerning Morris Family Employment.**

Plaintiff's claims about the fact that Morris family members are employed and paid by the Company are weaker still. In the end, having conceded the appropriateness of those individuals' qualifications and salaries, he could point to nothing more than that Mr. Clapsadl and Mr. Morris IV might have been advanced more quickly than others and that Ms. Clapsadl received a $10,000 pay increase when she took on the additional role of corporate Secretary. (Johns Tr. 121:3-5.) Those facts cannot support a claim for breach of fiduciary duty.

**VI. Plaintiff Cannot Establish his § 1140 Claim.**

Under 29 U.S.C. § 1140, a person who is discharged in order to deprive him of his rights under a plan can seek damages. *See Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 235-

36 (4th Cir. 1991). Here, as discussed above, Plaintiff's termination will not deprive him of amounts that he will ultimately be owed in 2028 based upon his participation in the Company's ESOP. As Plaintiff himself alleges: "Plaintiff is an ESOP participant who was recently discharged from employment, and as such *will* receive a distribution from the Plan *pursuant to its terms*." (Compl. ¶ 153, emphases added.)

Even if Plaintiff were able to articulate some basis for contending that his termination was a violation of § 1140, Plaintiff has not come forward with evidence sufficient to show that the reasons given by the Company – his downward spiral from potential CEO to his demotion to COO to his internal problems in dealing with employees and external difficulties in dealing with customers (*see generally* Leonard Decl. ¶¶ 20-23; Morris Decl. ¶¶ 19-26) – were a pretext to deprive him of some ERISA right. *See Hearne v. United Parcel Service, Inc.*, No. 5:06-CV-117-F, 2007 WL 3287758, at *15 (E.D.N.C. Nov. 2, 2007) (granting summary judgment on the ground that ERISA plaintiff could not demonstrate pretextual discharge). In addition, as stated by Professor Leonard, the Board determined that Plaintiff was no longer suitable for ESOP-related positions once he was no longer a Company employee (Leonard Decl. ¶ 23.) Plaintiff cannot show that the Board's rationale was somehow pretextual.

## CONCLUSION

Defendants respectfully request that their Motion for Summary Judgment be granted.

This the 12th day of November, 2024.

/s/ Pressly M. Millen
Pressly M. Millen
WOMBLE BOND DICKINSON (US) LLP
555 Fayetteville St., Suite 1100
Raleigh, North Carolina 27601
(919) 755-2135
press.millen@wbd-us.com

*Counsel for Defendants*

30