## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
## Civil Action No. 5:23-CV-00324-D-RJ

BRYAN J. JOHNS, individually and on
behalf of the Morris & Associates, Inc.
Employee Stock Ownership Plan,

        Plaintiff,

vs.

WILLIAM F. MORRIS III, DORIS
MORRIS, RANDY CLAPSADL, ROBERT
F. WARWICK, BRUCE BOWERS, JOHN
KIMBER, NED LEARY, ED LEONARD,
JOHN SHELL and MORRIS &
ASSOCIATES, INC., a North Carolina
Corporation,

        Defendants.

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Plaintiff Bryan J. Johns opposes Defendants' Motion for Summary Judgment (ECF No. 59).

## I.    INTRODUCTION

The Morris & Associates, Inc. Employee Stock Ownership Plan (the "Plan" or "ESOP") owns 75% of Morris & Associates, Inc. ("Morris Inc." or "the Company"). The remaining 25% is owned by Defendant William F. Morris III ("Bill Morris") and his family. Despite being minority shareholders, the Morris family controlled every facet of the Company. Through their control, they've been shortchanging the Plan and its participants, including Plaintiff Johns, for years. Specifically, they repeatedly told the valuation firm responsible for valuing the Plan's Morris stock that the Company had no excess cash even though the Company was sitting on anywhere from $30.7 million to $56.5 million in cash. Thus, the Plan's Morris stock was

1

repeatedly undervalued, the Plan's assets were diminished, participant accounts were undervalued, and retiring participants were underpaid. The Morris family also misappropriated the Plan's (and participants') dividends on Morris Stock, using those dividends to satisfy the Company's stock redemption liabilities while at the same time pocketing the full value of the dividends paid to them as minority shareholders.

The Morris family nominated Board Members. They were a majority of the Plan's Trustees. They set Bill Morris's compensation without any evaluation or process. They tithed Company assets to religious organizations of their choosing, including the private school attended by their children and grandchildren. And they believed they, and they alone, were entitled to sell their shares valued at the fair market value of the Company.

When Trustee Bryan J. Johns proposed hiring an Independent Fiduciary to represent the interests of the ESOP—the majority shareholder—and its participants, Bill Morris considered it an act of sedition and fired him.

Defendants acknowledge that they were required to use fair market value to value the Plan's shares. They acknowledge that the true fair market value of Morris Inc. was as high as $62–$63 million. They acknowledge that, at their instruction, cash was excluded from the Plan's equity value, producing Company bogus values ranging from $15.7 million to $22.8 million during the relevant period, even though the Company had $30.7 million to $56.5 million in cash on top of the operating value of the enterprise.[1] Defendants' Motion for Summary Judgment tries, but fails, to avoid these undisputed facts. The Motion should be denied in its entirety.

---

[1] Cash exceeded $70 million in 2023, but Defendants have not produced the 2023 Valuation Report. Ex. C to Boyko Decl. - Amended Brown Report at ¶ 39.

## II.    STATEMENT OF FACTS

### A.    The Morris Family Controlled the Company

Defendant Bill Morris took over the Company from his father and a business partner and immediately restructured it in 2003. Plaintiff's Additional Fact ("PAF") 8. In the restructuring, Bill Morris oversaw the formation of the ESOP because it was the "most favorable" thing to do "for the existing shareholders," which included the Morris family. PAF 9. Over time, the ESOP became the majority shareholder of the Company. But nothing at the Company changed when Bill Morris lost his shareholder majority. PAF 14. For example:

(1)    the Board of Directors was handpicked by Bill Morris without anyone else interviewing his nominees or considering alternative candidates. PAF 19 and 24.

(2)    Annual shareholder meetings did not include reviews of financial results or projections. PAF 23 and 68.

(3)    Bill Morris told his co-trustee that the Morris family had the final say on any sale of the Company. PAF 26.

(4)    Bill Morris hired his wife (Doris Morris), daughter (Sarah Clapsadl), son (Bill Morris IV), and son-in-law (Randy Clapsadl), placing his daughter and son-in-law in the key officer roles of Secretary and President, respectively. PAF 17.

(5)    The Board of Directors were never presented with the Company's audited or reviewed financials. PAF 30.

(6)    Company Directors did not understand who the Trustees of the ESOP, the Company's largest shareholder, were. PAF 31.

(7)    The ESOP Trustees, despite being the majority shareholder, wrongly believed that the ESOP shares were non-voting shares. PAF 41 and 44. They  believed that Bill Morris had "total control" of the Company. PAF 45 and 49.

(8)    Non-family Board members agreed: "It would be difficult for the [Morris] family to be in more control of the company than it was under Bill Morris." PAF 46.

(9)    Bill Morris believes he "remains the largest and controlling shareholder in Morris [& Associates]" even though the ESOP owns 75% of the shares.

(10)    The Board of Directors did not have a Compensation Committee, never studied Bill Morris's compensation, and did not have any goals or policies around how Morris's compensation should compare to peers. PAF 55 and 59.

3

(11)     At least some Board members had no idea what Bill Morris's compensation was or how it was determined. PAC 56.

(12)     At least between 2020 and 2023 the Board never discussed Bill Morris's compensation or whether his salary or other pieces of compensation were appropriate. PAF 57.

(13)     The Board never reviewed Bill Morris's performance. PAF 58.

(14)     Bill Morris started the Company's practice of tithing because that's "what the Bible says" and neither the Board nor anyone else oversaw Bill Morris and his wife's decisions of what religious causes to support with the Company's money. PAF 90–95.

(15)     The entities to which the Morris family directed Company funds included St. Davids, the school attended by the Morris' children and grandchildren. PAF 91.

1.     The Trustees.

In theory, the ESOP was run by an "Administrative Committee" which gave instructions to the ESOP's Trustees (the "Trustees"). In practice, however, the Administrative Committee never met or existed. PAF 86; Plaintiff's Response to DUF 5. One Trustee (and Morris family member), Randy Clapsadl, incorrectly believed he was on the Administrative Committee while another, Doris Morris, has never heard the term "Administrative Committee." PAF 86. Bill Morris, at times the sole member of the Administrative Committee, did not know of its existence, either. Plaintiff Response to DUF 5.

With no functional Administrative Committee, the ESOP was run by the Trustees. Initially, Bill Morris made himself the sole Trustee. PAF 10. For compliance reasons, Bill Morris selected a co-Trustee, Joan Thompson, who was herself a minority shareholder at the time and who, therefore, shared Bill Morris's interests. PAF 11–12. Thompson stopped being Trustee after a few years and, from 2012 until November 2018, three of the four ESOP Trustees were Morris family members, namely Bill Morris, his wife, Doris Morris, and his son-in-law, Randy Clapsadl. PAF 15. Doris Morris was unqualified to serve as Trustee, and she was picked only

4

because she was Bill Morris's wife. PAF 16. From the first time he named Plaintiff Bryan Johns, to be one of the Trustees, Bill Morris made it clear to Johns that Bill would win any disagreements among the Trustees. PAF 20.

Bill Morris stopped being a named Trustee when required by law to give up the title, but he continued to serve as a functional Trustee while naming his personal friend and longtime business associate, Bob Warwick, to replace him as a named Trustee. PAF 22.

The Trustees did not have meetings separate from the annual shareholder meetings; they did not meet to decide on voting the ESOP's shares on corporate matters; they did not meet to review the annual valuations of the ESOP's shares. PAF 27–28. Trustee Doris Morris (wrongly) believes that Bill Morris remains a Trustee to the ESOP and did not believe the Trustees were entrusted with voting on behalf of the ESOP in the shareholder meetings. PAF 41–42. Trustee Randy Clapsadl did not understand that the ESOP had (and has) a controlling interest in the Company. PAF 44. Despite representing the ESOP majority shareholder, the Defendant Trustees (other than Bill Morris) never nominated anyone to the Company Board of Directors, never proposed that the Board declare or increase a dividend, never originated any shareholder action of any kind, and never held a Board of Directors seat themselves. PAF 47–49.

2.    The Annual Valuations.

The Trustees were required annually to value the ESOP assets in the Plan's Trust at fair market value. Def. Undisputed Fact ("DUF") 7. Fair market value ("FMV") is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 US 546, 551 (1973). During the Relevant Period (except for the 2023 valuation) the annual valuations were performed by John Sudol of Crescent

Valuation Services, LLC. DUF 8. As part of his valuation process, Sudol would ask Sarah Clapsadl whether there was any "excess cash" in the company and each year Sarah Clapsadl would report back that there was no "excess cash." PAF 72. As a result, Sudol would exclude all the Company's cash holdings from his determination of the Company's (and the Morris stock held by the ESOP) equity value. PAF 71. Sudol did not undertake any independent analysis or evaluation as to whether the Company's cash was excess or not. *Id*. He simply accepted at face value the Company's guidance. *Id*. After this lawsuit was filed and after Sudol spoke to Defendants' counsel in this lawsuit, Sudol and Ms. Clapsadl tried to invent post-hoc explanations for the "no excess cash" treatment, but even those justifications are bereft of any serious analysis. Pltf. Response to DUF 13.

Sudol found that the Company had the following valuations as of December 31 of each year:

| 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|------|------|------|------|------|------|
| $17,735,000 | $18,997,000 | $17,549,000 | $15,735,000 | $17,518,000 | $22,844,000 |

In reality, counting the excess cash and correcting certain other (much smaller) errors, the Fair Market Value of the Company was:

| 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|------|------|------|------|------|------|
| $45,415,000 | $51,337,000 | $49,964,000 | $49,502,000 | $56,432,000 | $73,442,000 |

PAF 38.

Tellingly, Ms. Clapsadl had no idea whose decision it was to determine whether there was excess cash. PAF 72. Randy Clapsadl did not understand, or recall being asked, whether there was excess cash and, at least beginning with the 2020 valuation, Bryan Johns believed there was

6

excess cash. PAF 73, 79. Therefore, the instruction must have originated with Bill Morris. PAF 73. However, no one at the Company had any idea at what point cash becomes "excessive" or should be included in the Company's equity value. PAF 73–76, 81–84.

Excluding the cash was motivated by Defendants' desire to keep share prices low so that the people selling their shares (all former employees) would receive less money. PAF 85. However, Bill Morris has a separate shareholder agreement requiring his shares to be valued differently, if and when he ever sells them, in order to make sure he receives actual fair market value for his shares. PAF 110.

3.      The Dividends.

In recent years the Defendant Trustees (and Bill Morris as a member of the Plan's Administrative Committee) misappropriated Plan assets in the form of dividends on Morris stock. The Company's Board of Directors approved its first dividend at its October, 2021 meeting. PAF 7. The Administrative Committee has "sole discretion" to "request that company pay dividends directly to participants" but never made any decision about how dividends would be treated. PAF 87. The Plan document requires that the Company make sufficient contributions to the ESOP to satisfy redemptions of stock from retired participants. PAF 88. But instead of making company contributions as required by law and the Plan document, Defendants misappropriated dividends belonging to the Plan and its participants to satisfy this liability. *Id*. As a result, while the minority shareholders received dividends, the participants in the ESOP had their dividends repurposed to meet the Company's obligation to redeem shares of retirees and former participants instead of being paid directly to participants. *Id*.

7

4.     The Retaliation.

Far from a problem employee, Bryan Johns was "senior management" at the Company, alongside Bill Morris and Randy Clapsadl. PAF 97. The corporate reorganization that Defendants now depict as a "demotion" was an effort to reorganize to address the Company's growing size, and Johns maintained the same salary as COO compared to his compensation as President. PAF 96. In March 2023, Johns received an $81,000 performance bonus, the largest performance bonus of any non-Morris family member and larger than his bonuses in 2021 and 2022. Plaintiff Resp. to DUF 23; PAF 96 & 99.

Contemporaneous records show few, if any, concerns about Johns's performance. Bill Morris maintained a personal file of notes on Johns, with the last entry on September 15, 2022, seven months before Bill Morris terminated Johns. Plaintiff Response to DUF 23. That note criticizes Johns for "bitching about" cash not being included in the ESOP valuations, but notes that his job performance has been fine. *Id*. Notes in 2020 and 2021 were positive generally and specifically with respect to client interactions. *Id*. Johns was never cited for serious poor performance or placed on an improvement plan. *Id*. Bill Morris awarded Johns the largest performance-based bonus of any non-Morris family member in March, 2023. *Id*., *see also* PAF 99. Johns was terminated on April 24, 2023, only a month later. In an email to Press Millen, company counsel and Defendants' counsel here, Bill Morris explicitly linked the termination to Johns's actions on behalf of the ESOP. PAF 105–106, 107.

In between receiving the record bonus in March and being terminated in April, Johns had undertaken several steps to investigate whether hiring an Independent Trustee to represent and oversee the ESOP would be appropriate. PAF 99–104. Among the steps, on April 10, 2023, Plaintiff informed a Director, John Shell, that he was planning to bring in an outside lawyer to

advise the Board and the Trustees, and Shell indicated he would inform Bill Morris of that plan. PAF 103. Bill Morris long believed that Johns's questioning of the annual ESOP Valuations was out of line because Bill Morris was the boss and Bryan Johns was his employee. PAF 108. Bill Morris also prided himself on employing people loyal to him and did not tolerate questions about the ESOP valuations or his total control of the Company, calling such behavior "sedition." PAF 50–51, 109.

## III.    SUMMARY JUDGMENT STANDARDS

Summary judgment is only proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the case," *N & O Pub. Co. v. RDU Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010), and a "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, in considering a party's summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the non-moving party, and must draw all reasonable inferences in favor of the non-movant as well. *Adams. v. UNC–Wilmington*, 640 F.3d 550, 556 (4th Cir. 2011).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).

## IV. ARGUMENT

### A. Plaintiff Johns Unquestionably Has Standing to Bring Counts I–III

In defined contribution plan cases like this, a plaintiff satisfies "the requirements of Article III [where] he has alleged actual injury to his own Plan account . . . fairly traceable to [a defendant's] conduct . . . [and] likely to be redressed by a favorable judgment." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 592 (8th Cir. 2009); *see also In re Mutual Funds Inv. Litig.*, 529 F.3d 207, 216 (4th Cir. 2008) (first two elements met on plaintiffs' allegations "they suffered injury in that their retirement accounts were worth less than they would have been absent the breach of duty, and this injury was caused … by the fiduciaries' misconduct"); *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007) ("Graden alleges that Conexant's mismanagement of plan assets caused a loss to the plan that ultimately harmed him and other plan participants. . . . this allegation clearly qualifies as a concrete injury traceable to Conexant and redressable by a court") (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). A plaintiff has a cognizable injury in fact where she shows that "she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560). Defendants' challenge here to the injury in fact prong of Article III standing is meritless because Plaintiff's individual account in the Plan suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'" — to wit, monetary injury caused by Defendants' misuse of plan assets and undervaluation of the Plan's (and thus each participant's) Company stock. Monetary harm is the quintessential concrete injury under Article III. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("certain harms readily qualify as concrete injuries under Article III. The most obvious are traditional tangible harms, such as … monetary harms. If a defendant has caused …

monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."). Plaintiff Johns suffered two distinct economic injuries.

First, Plaintiff Johns has been harmed because he has not received the dividends from the Morris stock in his Plan account; the Company, under the direction of Bill Morris, took Plaintiff's (and the Plan's dividends) to satisfy the Company's redemption liability. PAF 87–88. Specifically, Johns beneficially owned Company stock in the ESOP and that stock generated dividends. PAF 1, 7. However, the Company used the dividends on Johns's stock to redeem shares of retirees and former participants. PAF 88. Johns should have received the dividends plus an annual allocation of stock redeemed by the Company using Company contributions (instead of with the Plan's dividends). Instead, Johns received only allocations of stock; not dividends. Johns would have more Company stock or more cash if his dividends had not been misappropriated.[2]

Second, the value of Plaintiff's Plan account is less than it otherwise would have been had his and the Plan's Morris stock been appraised at fair market value, rather than below fair market value. In an ESOP lawsuit, the damages to plan participants are coextensive with the Plan's damages. *Perez v. Bruister*, 823 F.3d 250, 257–58 (5th Cir. 2016). Defendants' reliance on the Supreme Court's decision in *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020), is misplaced. The plaintiffs in *Thole* lacked a "concrete stake in the lawsuit" because they were "***participants in a defined-benefit plan***," which guaranteed them a fixed payment each month no matter whether the plan's assets lost or gained value due to the fiduciaries' investment decisions. The

---

[2] Furthermore, by paying cash dividends to the minority shareholders but using the ESOP's dividends to offset corporate liabilities, the Company (and the ESOP shares as a result) was worse-off because the minority shareholders extracted their full dividends *and* benefitted from the ESOP's (post-tax) dividend being used to offset what should have been a pre-tax corporate expense.

plaintiffs "possess[ed] no equitable or property interest in the plan." *Id*. at 542–43.[3] In explaining why the plaintiffs lacked standing, the Court explicitly distinguished defined-benefit plans and defined contribution plans (like the Plan here), in which "the retirees' benefits are typically tied to the value of their accounts, and the benefits can turn on the plan fiduciaries' particular investment decisions." *Id*. at 540. *Thole* itself recognizes that a different analysis is needed for participants in defined contribution plans because they "retain an individual equitable interest in the plan and may sue for enforcement of that interest." *Davis v. Old Dominion Freight Line, Inc.*, No. 1:22-990, 2023 WL 5751524, at *5 (M.D.N.C. Sept. 6, 2023) (citing *Thole*, 140 S. Ct. at 1619–20).

Moreover, Article III does not require a ***sale*** of securities to establish loss, damage, or standing. Courts consistently recognize that "unrealized losses" are a basis for suit. *LaRue v. DeWolff, Boberg & Assoc., Inc.*, 552 U.S. 248, 256 (ERISA "authorize[s] recovery for fiduciary breaches that impair the ***value*** of plan assets in a participant's individual account.") (emphasis added); *see also Reetz v. Lowe's Companies, Inc.*, No. 5:18-75, 2019 WL 4233616 (W.D.N.C. Sept. 6, 2019) (certifying a class of plan participants regardless of whether they sold the allegedly imprudent investment); *Adams v. Watson*, 10 F.3d 915, 920 (1st Cir. 1993) ("'injury in fact' need not entail currently *realized* economic loss") (emphasis in original); *New Valley Corp.*

---

[3] "A defined benefit plan ... consists of a general pool of assets rather than individual dedicated accounts. Such a plan, as its name implies, is one where the employee, upon retirement, is entitled to a fixed periodic payment. The asset pool may be funded by employer or employee contributions, or a combination of both." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (cleaned up). On the other hand, a "defined contribution plan is one where employees and employers may contribute to the plan, and the employer's contribution is fixed and the employee receives whatever level of benefits the amount contributed on his behalf will provide. A defined contribution plan provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account." *Id.* (cleaned up).

*v. United States*, 72 Fed. Cl. 411, 414 (2006) (describing unrealized, or "paper losses" as "general damages"); *see also In re Mutual Funds*, 529 F.3d at 218 n.4 ("any fraud that diminishes the **value** of the participant's individual account is a harm") (emphasis added). Courts recognize that so long as the Plan's stock has been undervalued, plan participants like Johns suffer economic loss. *Bruister*, 823 F.3d at 258.

Courts routinely find standing satisfied for any participant who invested in an allegedly imprudently managed investment, regardless of whether those losses have been realized by the sale of the investment, even after *Thole*. *See, e.g.*, *Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 132 (3d Cir. 2022) (finding standing based on what participants "invested in" regardless of whether they sold their holding); *Wachala v. Astellas US LLC*, No. 20-3882, 2022 WL 408108 (N.D. Ill. Feb. 10, 2022) (certifying class of participants whose plan accounts "invested in" the challenged investment); *In re Omnicom ERISA Litig.*, No. 3:18-1538, 2022 WL 18957200, at *11 (S.D.N.Y. Aug. 11, 2022) (same); *Reidt v. Frontier*, No. 3:18-1538, 2024 WL 4252646 *3 (D. Conn. Sept. 20, 2024) (plan participants are entitled to "not only what is in their accounts, but also to what <u>should be</u> there") (emphasis in original).

The "sell-to-sue requirement for maintaining an ERISA claim" that Defendants champion is meritless. In a decision rejecting an ESOP trustee's argument that a plaintiff-participant lacked standing for want of injury in fact, the court held: "the Court declines to find that an ERISA beneficiary must sell his or her shares in order to be able to have standing to raise an ERISA breach of fiduciary duty claim." *McMaken on behalf of Chemonics Int'l, Inc. Emp. Stock Ownership Plan v. GreatBanc Tr. Co.*, No. 17-4983, 2019 WL 1468157, at *10 (N.D. Ill. Apr. 3, 2019) (citing *Swain v. Wilmington Tr., N.A.*, No. 17-71, 2018 WL 934598, at *3 (D. Del. Feb. 16, 2018) (declining to impose a sell-to-sue requirement for maintaining an ERISA claim)). There is

13

no such requirement in this ESOP lawsuit. Further, although Defendants speculate that they or their successors may eventually value the Company properly at some undetermined date before Johns takes a distribution from the Plan, the statute does not require participants to wait years or decades for breaches of duty harming them to be corrected by a court. ERISA permits a participant to seek equitable relief to make sure the statute's and plan document's mandates are immediately followed. 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3). For example, ERISA § 502(a)(3) provides a participant may bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan." 29 U.S.C. § 1132(a)(3). That's what Plaintiff does here. In addition to seeking the Plan's losses, Count I of Johns's Complaint specifically seeks "equitable relief, including an order enjoining [Defendants] from conducting flawed valuations . . . and other equitable or remedial relief as appropriate." Complaint ⁋ 127 (ECF No. 1).

Defendants' *Thole*-based argument doubly fails when applied to the facts in this case. Again, the Supreme Court in *Thole* found no standing because the underfunding of the pension plan did not "demonstrate a substantially increased risk" to the participant.[4] *Thole*, 590 U.S. at 546. But here Defendants not only have *perpetually* declared there was no excess cash that should e count toward equity value, they have explained that in light of their conservative nature and future plans they are unlikely to start including cash in ESOP valuations (and certainly not at the levels Plaintiff purports to be reasonable) anytime in the future. Def. Memo. at 8–9

---

[4] The Supreme Court in *Thole* focused largely on a unique feature of defined benefit pension plans, namely PBGC insurance, which would almost certainly make the plaintiff in that case whole if the pension plan were unable to make the promised payments. *Thole*, 140 S.Ct. at 1621. No such coverage exists for Mr. Johns here, where the ESOP is a defined contribution plan.

(identifying characteristics of the Company they contend justify ignoring the value of cash holdings). Thus, unlike in *Thole*, the imprudent acts which have already caused Plaintiff unrecognized losses are likely to continue until the losses are recognized — a point which could come as early as next year. PAF 3–4. Moreover, their assertion about their conservative management is antithetical to the standard of fair market value on which Plaintiff's injury is premised. Fair market value assumes the sale of the company by hypothetical sellers to hypothetical buyers. To attempt to define fair market value by assuming a conservative business practice defies the premise of hypothetical and shows Defendants have no grasp of the standards at issue.

In short, there is no authority to support the notion that Plaintiff's injury will be cured by the mere passage of time. Courts before and after *Thole* have not required losses from an imprudent investment to be "realized" (for the investment to be sold) to generate standing. Unrealized losses, like the undervalued ESOP shares in Johns's account, nevertheless convey Article III standing.

**B.    Plaintiff's Claims are Not Barred by the Statute of Limitations**

Defendants' argument that Plaintiffs' Counts I–III are time-barred misstates the law, facts, and Johns's testimony.[5] Defendants discuss only the three-year statute of limitations in ERISA, and thus Plaintiff's response is so limited.

1.    Johns Did Not Have "Actual Knowledge" in 2019.

To find that a plaintiff had "actual knowledge of a breach of violation" to shorten the limitations period to three years, Defendants must prove that Johns had "actual knowledge of all material facts necessary to understand that some claim exists, which facts could include

---

[5] Defendants have not moved for Summary Judgment on Count IV based on the statute of limitations.

necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm." *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1177 (3d Cir. 1992). Plaintiff's Count I alleges that the Defendants failed to provide CVA with "complete and accurate information to conduct the valuations" (ECF No. 1 at ¶ 122) because they reported to CVA there was no "excess cash." Johns himself testified that until the 2019 Valuation (performed less than three years before filing this Action) "reasonable people [could] disagree" on whether there was excess cash. PAF 61. Therefore, he did not have actual knowledge that Defendants were providing inaccurate information to CVA until the 2019 Valuation, performed in 2020.

Defendants argue that Johns was "on notice" when he received an email on September 11, 2019 (DX 15), but notice is not "actual knowledge." *Intel v. Sulyma*, 589 U.S. 178, 184 (2020). "[T]o charge plaintiff with actual knowledge of an ERISA violation, it is not enough that he had notice that something was awry; he must have had specific knowledge of the actual breach of duty upon which he sues." *Ruffin v. New England Life Ins. Co.*, No. 7:03-35, 2008 WL 11429993, at *5 (E.D.N.C. Dec. 1, 2008). *Ruffin* is instructive because there the plaintiff received a letter from an attorney laying out the claimed violations, yet the Court denied summary judgment on the statute of limitations because while the letter "constitute[d] evidence of knowledge… of some breach, it does not, as a matter of law, provide that [plaintiff] had actual knowledge." *Id.*

Likewise, here Plaintiff testified that even after receiving the 2019 e-mail Defendants identify, he viewed the representation that there was no excess cash to be a matter of business judgment. PAF 5, 61. Indeed, armed with one person's opinion that cash was excessive, Johns raised the issue with Bill Morris, Randy Clapsadl, and Rick Tuggle and was convinced that the cash was properly excluded from the 2018 Valuation. Pltf. Response to DUF 21. The fact is, as

16

much as Defendants would disagree, ***Plaintiff is not an expert in business valuation***. PAF 52. Johns testified that after receiving the letter he thought "it feels like what we are doing here is not quite in line with that we should be doing" (Pltf Response to DUF 21), but that is not the standard for actual knowledge of a breach of fiduciary duty. *Ruffin*, 2008 WL 11429993, at *5.

        2.     Even if Johns had "Actual Knowledge" that the 2018 Valuation Violated f ERISA, his Claims Concerning the Remaining Valuations are Not Barred.

Even if Johns did have "actual knowledge" of a breach of fiduciary duty with respect to the 2018 Valuation in 2019, he could not have had actual knowledge of the 2019–2022 valuations. Each improper valuation is a discrete breach of duty for which a separate claim accrues. At the risk of stating the obvious, one cannot possibly have actual knowledge of something that hasn't happened yet. So, Johns could not have actual knowledge in 2019 that Defendants would breach their duties in future years, particularly since the Company's cash holdings were growing over time. And all the bogus valuations and accompanying breaches after 2019 occurred within the three years prior to filing the Complaint. Defendants had a continuing duty to provide accurate information to CVA and to ensure that the valuations provided reflected the fair market value of the Company each year. DUF 7; *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). At best, then, Defendants' actual knowledge argument would apply to the 2018 valuation, and only the 2018 valuation.

### C.    Defendants Waived any Unclean Hands Defense

Defendants next raise the defense of unclean hands, or *in pari delicto*. While Defendants are wrong that Johns "did nothing" until 2023 (Pltf. Response to DUF 22(h) and 23; PAF 50–52), their argument fails as a matter of law: (1) Defendants did not plead unclean hands as an affirmative defense, as required; and (2) unclean hands and *in pari delicto* are not defenses to Plaintiff's claims on behalf of the Plan.

Rule 8(b)(1) requires a defendant to plead "in short and plain terms its defenses to each claim asserted against it." Fed. R. Civ. P. 8(b)(1)(A). Rule 8(c) further requires a defendant to "affirmatively state any avoidance or affirmative defense." Fed. R. Civ. P. 8(c)(1). Unclean hands is an affirmative defense. *Vandevender v. Blue Ridge of Raleigh, LLC*, No. 14-150, 2015 WL 355281, *2 (E.D.N.C. Jan 27, 2015). Even asserting the defense, which Defendants did not do, is not sufficient. *Id*. Rather, Defendants needed to plead the defense "with enough specificity to provide [plaintiff] with the requisite fair notice." *Wesler v. VP Racing Fuels, Inc*., No. 1:20-176, 2021 WL 4053415, at *8 (May 10, 2021); *Malibu Media, LLC v. Doe*, No. 13–512, 2015 WL 1402286, at *3 (D. Md. Mar. 25, 2015) ("Where asserted, unclean hands must be pled with the specific elements required to establish the defense."). Here, Defendants did not plead the defense *at all*, let alone with specificity, and therefore are barred from asserting it. ECF No. 31 at 9–10 (Answer).

Even if they had pleaded the defense, their motion would fail because Plaintiff brings Counts I–III for relief to the Plan as a whole, such that the equitable doctrines Defendants assert against him individually are not available defenses. *See*, *e.g.*, *MeLemore v. Regions Bank*, 682 F.3d 414, 421–22 (6th Cir. 2012) ("ERISA plans are innocent of any wrongdoing"); *Sec'y of U.S. Dep't of Lab. v. Kavalec*, No. 1:19-968, 2020 WL 1694560, at *8 (N.D. Ohio Apr. 7, 2020); *Castle v. Cohen*, 676 F. Supp. 620, 628 (E.D. Pa. 1987), *aff'd and remanded*, 840 F.2d 173 (3d Cir. 1988); *Rush v. GreatBanc Tr. Co.,* No. 19-738, 2021 WL 2453070, at *8–9 (N.D. Ill. June 16, 2021); *Trustees of New York City Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund, & Apprenticeship, Journeyman Retraining, Educ. & Indus. Fund v. M.C.F. Assocs., Inc.*, 530 F. Supp. 3d 460, 465–66 (S.D.N.Y. 2021) ("Defendants' unclean hands theory is inconsistent with ERISA, since the statute limits the defenses available to an employer when

sued by an employee benefit plan."). In short, Plaintiff brings this action on behalf of the entire plan and the Plan has no fault at all for allowing Defendants' misconduct.

Further, even if the defense could be validly pleaded, the defense fails on its merits. The doctrine applies "[o]nly when some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks." *Keystone Driller Co. v. General Excavator Co*., 290 U.S. 240, 245 (1933). The defense is "narrowly limited to situations in which the plaintiff was equally at fault with the defendant." *Skinner v. E.F. Hutton & Co.,* 314 N.C. 267, 272 (S.Ct. N.C. 1985).

Johns was ultimately willing to lose his job to voice his concerns for him and his fellow ESOP stockholders. Defendants struggle to simultaneously depict Johns as a troublemaker hell-bent on taking over the Company and a complicit stooge. He was neither. Johns, while not a valuation expert himself, believed valuations seemed low but that the decision to exclude all cash from the valuation was a matter of business judgment or expert ESOP opinion until the 2020 Valuation, when the Company's cash holdings reached record levels. PAF 5, 52. Even with Defendants representing that the ESOP's shares could be outvoted by Bill Morris, Johns attempted to have an independent director elected, only to be shot down. PAF 19. When Johns persisted, by trying to engage an independent fiduciary to be a trustee to the ESOP, he was terminated and removed from the Administrative Committee and as Trustee. Factually, there is nothing to suggest that Johns—who consistently questioned the exclusion of cash from the valuation and who attempted to nominate an independent director and an independent trustee—was "equally at fault" with the Defendants who had full control of the Company and who shot Johns down time and again before firing him.

Finally, any state law claim is preempted by ERISA. *Dairy Emps. Union Loc. No. 17 v. Poel*, No.12-4550, 2014 WL 12884088, at *6 (C.D. Cal. Sept. 15, 2014). In enacting ERISA, Congress provided that the Act "shall supersede any and all State law insofar as they may now or hereafter relate to any [non-exempt] employee benefit plan described in section 1003(a) of this title…" 29 U.S.C. § 1144(a). This preemption applies to state statutory and common law claims. *See*, *e.g.*, *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Bhd. Labor Leasing*, 950 F. Supp. 1454, 1460 (E.D. Mo. 1996), *amended on denial of reconsideration*, 974 F. Supp. 751 (E.D. Mo. 1997), *aff'd sub nom. Chicago Truck Drivers, Helpers & Warehouse Workers Union Pension Fund v. Bhd. Labor Leasing*, 141 F.3d 1167 (8th Cir. 1998).

### D.  Disputed Material Facts on Fair Market Value Preclude Summary Judgment on Count I

Count I alleges Defendants repeatedly undervalued the Company by failing to properly treat the Company's cash holdings. Defendants seek to summary judgment on this claim based on the erroneous premise that the Company gave CVA accurate and complete information. Not true (or, at a minimum, disputed). Defendants told CVA that Morris Inc. had zero "excess cash." Plaintiff's expert disagrees. PAF 35–38; Pltf. Response to DUF 12. And CVA didn't do anything to evaluate whether what Defendants told it about excess cash was true. PAF 71. Further, Defendants seem to conflate the business judgment of whether the Company should hoard cash (yes, course companies can hoard cash) with, from a valuation perspective, whether the cash accrues to equity value (yes, of course cash has value). At bottom, Defendants argue that there are no material disputed facts surrounding the appropriateness of the decision to value a $23 million operating company with over $50 million in the bank at only $23 million. But material disputed facts abound.

20

They imply that Defendants' successes in "steering Morris & Associates for the past 21 years" is somehow relevant to whether the Company's cash should have been called "excess" and included in the valuation. Def Memo. at 27. But Defendants themselves had no idea if there was "excess cash" or if the cash should have been included in the equity value. PAF 70–84. The facts are that Bill Morris, whom Defendants credit with the Company's success, insisted that ESOP valuations are different than fair market valuations and judged the Company's fair market value to be $62 or $63 million (Morris Tr. 161:14–20) at a time when CVA valued the Company at only $18.437 million because Defendants told CVA to ignore $38.4 million in cash. PAF 34–38. Plaintiff's claim does not come down to a "difference of opinion" because Defendants have not marshalled any credible evidence that "excess cash" should not have been treated as such; nor have they adduced testimony from anyone at the Company who understands what "excess cash" is; and their instructions to the valuation firm that there was no excess cash were unsubstantiated until they came up with some flimsy rationales when the valuation advisor told them what to say after the lawsuit was filed.

Further, the appropriate treatment of cash for valuation purposes is in large measure a question of expert proof and opinion. *See, e.g., Donnelly v. Propharma Group Topco LLC*, No. 21-894, 2023 WL 418538 (D. Del. Jan 9, 2023) (finding admissible testimony from parties' business valuation experts). Plaintiff's expert offers detailed analyses supporting his opinion that cash in excess of 2% of revenue accrued to equity value. Plt. Response to DUF 12. Mr. Sudol, who performed the annual valuations, conceded he didn't do any independent analysis of whether the Company had excess cash. PAF 71. And Defendants' expert offered no opinion on whether there was excess cash in the Company, only challenging Plaintiff's expert analysis of that issue. PAF 82. Under these circumstances, there are plainly disputed material facts about

whether some amount of cash should have been included in setting the Company's equity value. *Reyazuddin v. Montgomery Co.*, 789 F.3d 407, 417 (4th Cir. 2015) ("a battle of the experts [] should not be resolved at summary judgment.")

Finally, Defendants propose that they may have uses for some or all the cash in the future. But that is not the issue (and Plaintiff disputes it in any event, *see* Pltf. Resp. to DUF 14). But the standard for fair market value is not what idiosyncratic individuals might want to do at some underdetermined future date; rather, it is the price at which a hypothetical seller and hypothetical buyer would execute a sale of the Company and whether the cash would have value to those hypothetical persons. PAF 36.

### E. Defendants are Not Entitled to Summary Judgment on Plaintiffs' Counts II and III

Defendants seek to summary judgment on Counts II and III because, they argue, Plaintiff has failed to adduce evidence of damages. This argument ignores that money remedies are not the only remedies available. ERISA § 502(a)(2) provides in relevant part that "A civil action may be brought … by a participant … for appropriate relief under section 409." 29 U.S.C. § 1132(a)(2). Section 409(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and **shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary**.

29 U.S.C. § 1109(a) (emphasis added). The Supreme Court has held § 409(a)'s remedy of "equitable or remedial relief" is *additional* to § 409(a)'s monetary remedy for "losses" resulting from a fiduciary's breach of duty, and such equitable or remedial remedies are likewise made available to "protect the entire plan." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140–42

22

(1985). Apart from the question of prior losses, Plaintiff may seek—as "equitable or remedial relief"—injunctive relief and other remedies such as removal of a fiduciary to protect the Plan and its participants going forward. *See also Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993) (identifying injunctions as a "categor[y] of relief that w[as] typically available in equity").

In Counts II and III, Plaintiffs allege breaches of duty in the setting of Bill Morris's compensation and in the governance of the Company. As Trustees of the ESOP, Defendants had a duty to monitor executive compensation and corporate governance matters. As detailed above in the summary of facts, they did nothing. That is, they failed to act as a prudent person would have acted under the circumstances then prevailing. *See Tatum v. RJR Pen. Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) (the prudent person inquiry goes to whether plan fiduciaries used appropriate methods). These failures of process, as detailed in the expert report and testimony of Plaintiff's expert Seth Rosen (PAF 46), are breaches of fiduciary duty, the remedies for which go beyond monetary relief. *See Tatum*, 761 F.3d at 356 (ERISA provides for both monetary and equitable relief). Notably, Defendants did not proffer an expert on corporate governance processes and therefore have no contrary evidence. Plaintiffs have requested equitable remedies to cure these breaches such as removal of the Plan's Trustees and appointment of an Independent Fiduciary. Cmplt. ¶ 135 (Count II), ¶ 146 (Count III). Because Defendants' motion is based solely on the theory that Plaintiff cannot prove economic loss on the evidence, not that there are no disputed material facts about Defendants' governance failures and commensurate breaches, their motion must be denied.

### F. Defendants are Not Entitled To Summary Judgement on Count IV Because the Facts Demonstrate That They Terminated Johns Because of his Retaliation Claim

Relevant here, ERISA § 510 declares it: "[u]nlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any

23

right to which he is entitled" if the right is "under the plan" or under "ERISA." 29 U.S.C. 1140; *see also*, *e.g.*, *Diven v. Fairmont General Hosp., Inc.*, No. 11-27, 2011 WL 7431715, at *2 (N.D. W.V. Nov. 23, 2011) (plaintiff can state a claim for violation of ERISA § 510 by alleging her firing "was motivated, as least in part, by a desire to interfere with her pension rights under the ERISA plan."). Indeed, the Fourth Circuit has noted that § 510 should be interpreted broadly, as "the Act clearly contemplates suits to protect any rights implicated by employer action." *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 237, 239 (4th Cir. 1991) ("[T]he primary focus of § 510 is to prevent unscrupulous employers from discharging or harassing their employees…"); *Harris v. Johns Hopkins Health Systems Corp.*, No. 23-701, 2023 WL 3624733 (D. Md. May 23, 2023) (same).

As Defendants' own authority states, "ERISA guarantees that no employee will be terminated where the purpose of the discharge is the interference with one's pension rights." *Hearne v. United Parcel Service, Inc.*, No. 5:06-117, 2007 WL 3287758, at *15 (E.D.N.C. Nov. 2, 2007). Plaintiff must only show that he: (1) engaged in an activity protected under ERISA; (2) suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action. 29 U.S.C. § 1140; *Acost v. Brain*, 910 F.3d 502, 514 (9th Cir. 2018).

Johns has the right to have his shares valued fairly and had both the right and obligation at the time to investigate the valuation of the ESOP and protect the majority-shareholder ESOP from abuses and unchallenged control by the Morris family, the minority shareholders. Terminating him under such circumstances is a violation of ERISA § 510.

Whether there is a causal link between Johns's action in the spring of 2023 on behalf of the ESOP and his termination is classic factual battle. On the one hand, Defendants present

declaration testimony from a Defendant (Bill Morris) and a director with no personal knowledge except what he was told by Bill Morris (Leonard) about the reasons for Johns's termination as purportedly performance related.

On the other hand, Plaintiff presents a compelling chronology (Johns Decl. ¶¶ 19–27) not only showing that Johns was considered a highly valued employee of the Company by Bill Morris as late as March 2023, but also that his termination days later was linked to Morris discovering Johns's work in performance of his obligations as a Trustee in questioning the decision to exclude all cash from the valuations and seeking outside guidance that would have removed some or all of the conflicts of interest that permeated the leadership of the ESOP. While the Court should never believe the word of Defendant Bill Morris over the compelling facts, it certainly cannot rule as a matter of law that Bill Morris's unsupported story is sufficient to grant his motion.

## V.  CONCLUSION

For the reasons stated herein, Defendants' motion should be denied.

25

Dated:    December 17, 2024

Respectfully submitted,

/s/ Mark G. Boyko_____
Gregory Y. Porter (pro hac vice)
Mark G. Boyko (pro hac vice)
David A. Felice (pro hac vice)
**BAILEY & GLASSER LLP**
1055 Thomas Jefferson Street, NW, Ste. 540
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
gporter@baileyglasser.com
mboyko@baileyglasser.com
dfelice@baileyglasser.com

Alan B. Felts
N.C. State Bar No. 42826
J. Nathan Duggins III
N.C. State Bar No. 22029
Denis E. Jacobson
N.C. State Bar No. 13559

**TUGGLE DUGGINS P.A.**
400 Bellemeade Street, Ste. 800
Greensboro, NC  27401
Telephone: (336) 378-1431
Facsimile: (336) 274-6590
AFelts@tuggleduggins.com
NDuggins@tuggleduggins.com
DJacobson@tuggleduggins.com

*Attorneys for Plaintiff Bryan J. Johns*

## CERTIFICATE OF SERVICE

I hereby certify that on this date the foregoing document was electronically filed with the

Clerk using the CM/ECF system, which will send a notice of electronic filing to all registered

users of the CM/ECF system.

Dated: December 17, 2024

By: /s/ *Mark G. Boyko*
Mark G. Boyko